# EXHIBIT A

<u>CONSENT TO REMOVAL</u>

I, Michael Tryon, declare under penalty of perjury that the following is true and correct.

1.     I am Senior Litigation Counsel and the ADOT Unit Chief, State Government Division, at the Office of the Arizona Attorney General.  I am one of the attorneys for Defendant the State of Arizona in connection with the litigation captioned *Donald Shooter v. State of Arizona, et al.*, which is currently pending in the Superior Court of Arizona in Maricopa County, Case No. CV2019-050782 (the "Litigation").  I am competent to testify to the matters contained in this Consent to Removal.

2.     Pursuant to 28 U.S.C. § 1446(b), the State of Arizona consents to the removal of the Litigation to the United States District Court for the District of Arizona.  By consenting to the removal, the State of Arizona agrees to waive its Eleventh Amendment immunity with respect to, and only with respect to, the claims asserted in the Litigation.

EXECUTED this 11 day of March, 2019.

G. MICHAEL TRYON

# EXHIBIT B

Skip To MainContent

Search

Civil Court Case Information - Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2019-050782 | Judge: | Campagnolo, Theodore |
| File Date: | 1/29/2019 | Location: | Northeast |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Donald M Shooter | Plaintiff | Male | Thomas Horne |
| State Of Arizona | Defendant | | Pro Per |
| Kirk Adams | Defendant | Male | Pro Per |
| Janae Adams | Defendant | Female | Pro Per |
| Javan Mesnard | Defendant | Male | Pro Per |
| Holly Mesnard | Defendant | Female | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 2/25/2019 | AFS - Affidavit Of Service | 2/28/2019 | |
| **NOTE:** JANAE ADAMS KIRK ADAMS | | | |
| 2/25/2019 | AFS - Affidavit Of Service | 2/28/2019 | |
| **NOTE:** MR JAVAN JD HOLLY MESNARDD | | | |
| 2/25/2019 | SUM - Summons | 2/27/2019 | |
| 2/25/2019 | SUM - Summons | 2/27/2019 | |
| 2/25/2019 | SUM - Summons | 2/27/2019 | |
| 2/25/2019 | SUM - Summons | 2/27/2019 | |
| 1/30/2019 | SUM - Summons | 2/1/2019 | |
| 1/30/2019 | AFS - Affidavit Of Service | 2/4/2019 | |
| **NOTE:** STATE OF ARIZONA | | | |
| 1/29/2019 | COM - Complaint | 1/31/2019 | |
| 1/29/2019 | CSH - Coversheet | 1/31/2019 | |
| 1/29/2019 | CCN - Cert Arbitration - Not Subject | 1/31/2019 | |
| 1/29/2019 | NJT - Not Demand For Jury Trials | 1/31/2019 | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

# EXHIBIT C

1  Thomas C. Horne, Esq. SBA 002951
2  **HORNE SLATON, PLLC**
   6720 North Scottsdale Road, Suite 285
3  Scottsdale, AZ 85253
4  Tel: (480) 483-2178
   Fax: (480) 367-0691
5  Email: Horne@HorneSlaton.com
6  *Attorneys for Plaintiff*

**COPY**

JAN **29** 2019

CLERK OF THE SUPERIOR COURT
A. VALENZUELA
DEPUTY CLERK

7
8
## ARIZONA SUPERIOR COURT
## MARICOPA COUNTY

9

10  **DONALD M. SHOOTER, an individual,**

11              Plaintiff,

12  vs.

13

14  **STATE OF ARIZONA;  KIRK and JANAE ADAMS, husband and wife;**
15  **JAVAN  "J.D." and HOLLY MESNARD, husband and wife,**
16

17              Defendant.

18

NO.   CV2019-050782

**COMPLAINT**

**Civil Rights Violation, Including Violation of 42 U.S.C. §1983, Defamation, False Light Invasion of Privacy,  and Aiding and Abetting and Conspiracy, and Wrongful Termination**

**JURY TRIAL DEMANDED**

19

20       Plaintiff alleges as follows:

21
22
## JURISDICTION AND VENUE

23       1.     Plaintiff Donald Shooter was a member of the Arizona House of

24  Representatives, or at other times was a member of the Arizona Senate, and was for a

25
26  time Chairman of the Senate Appropriations Committee, Chairman of the House

27  Appropriations Committee and Chairman of the Joint Legislative Budget Committee.

28       2.     During all times relevant, Defendant Kirk Adams was Chief of Staff to

the Governor of Arizona.

3.     During all times relevant Defendant Javen Mesnard was Speaker of the Arizona House of Representatives.

4.     The actions of Adams and Mesnard were for the benefit of their respective marital communities consisting of themselves and their respective wives..

5.     Jurisdiction and venue are proper in Maricopa County.

I.     **FACTUAL PREDICATE TO CLAIMS INCLUDING DEFENDANTS' CORRUPT MOTIVES FOR THE VIOLATION OF CIVIL RIGHTS, DEFAMATION, AND FALSE LIGHT, INVASION OF PRIVACY AND CONSPIRACY (AND PUBLIC RECORDS REQUEST VIOLATIONS?)**

   A.     **Donald Shooter Begins His Investigation Into Rigged Bids and Wasteful Spending**

6.     In his position as Chairman of the Senate Appropriations Committee, Mr. Shooter began to discover questionable practices related to State expenditures on technology.

7.     Senator Shooter learned of a significant investment in Hewlett Packard for the Arizona Department of Administration data center, initiated and led by Aaron Sandeen, the former Arizona State CIO. Senator Shooter was told that this purchase was undertaken at the same time that Mr. Sandeen was purportedly serving as a member on a Hewlett Packard National Advisory Board.

8.     Another example was relayed to Senator Shooter by Henry Darwin, the Governor's Chief of Operations about his experience while serving in his prior role as the Arizona Director of the Department of Environmental Quality ("DEQ").

9.      Mr. Darwin told Senator Shooter, in the presence of another witness, that Mr. Sandeen, when serving as CIO for the State, required DEQ to select a vendor the agency did not want to use, at a cost of an additional two million dollars to DEQ, a vendor which Mr. Darwin alleged, then became a client shortly after Sandeen stopped working for the state.

10.     These alleged incidents greatly troubled Senator Shooter.

11.     Senator Shooter's concerns were magnified when he learned of the state's use of "Competition not Practicable" or "Sole Source" contracts for large technology purchases. These are contracts where the State does not engage in a competitive bidding process, but rather chooses a vendor because the product is so unique, so rare that if the state attempted a competitive bid process, only that "sole"/one vendor could respond. Often, because there is no competition, that vendor is able to dictate many of the contract terms including price and service level agreements.

12.     One example of such a no-bid, sole source contract uncovered by Senator Shooter was for "general cloud services" or cloud data storage, which the state entered into with Amazon Web Services ("AWS") in March 2017 (and remains in effect as of this filing).

13.     Sole source, defined in A.R.S. §41-2536, allows the State to award a contract without competition only if the director of the Department of Administration determines in writing that there is only one source for the required product or service.

That statute requires that sole source procurement "shall be avoided, except when no reasonable alternative sources exist."

14. "General cloud services" are provided by numerous companies including those based in Arizona, employing Arizona workers and therefore a competitive bidding process was required; Amazon Web Services is not the sole provider of general cloud services.

15. In fact, AWS is perceived as on the high end of the cost spectrum and for the difficulty and prohibitive costs clients face when attempting to withdraw data stored with AWS.

16. Senator Shooter discovered evidence of additional no-bid contracts to buy technology products and services. Curiously, there was little or no effort to level the playing field.

17. Instead, Senator Shooter found a concerted effort at the Department of Administration to direct work to specific, high priced, out-of-state companies by avoiding competition at the expense of Arizona workers and employers, and to the detriment of Arizona taxpayers.

18. Senator Shooter's proposed solution was simple: permit qualified vendors the opportunity to fairly compete.

**B.** **Shooter Tries to Address Concerns Over Wasteful Government Spending**

19.   In 2016, Senator Shooter introduced SB1434, with the goal of encouraging state agencies to migrate to the cloud and modernize technology systems.

20.   In preparing SB1434, Senator Shooter met with representatives from Amazon, Dell, and Google, all recognized leaders in the technology industry. The bill included an oversight provision which would have required a state agency, when investing in an IT project anticipated to cost more than $2.5 million, request at least two bids prior to entering into a contract. Agencies did not have to obtain two bids, just request them.

21.   Throughout the 2016 legislative session, Senator Shooter worked with representatives of the Governor's Office including the Governor's Deputy Chief of Operations as well as the state's Chief Information Officer (CIO) Morgan Reed to modify and refine the bill.

22.   Through the course of these revisions, SB 1434 was amended to require the state Department of Administration (DOA) to report to JLBC how many bids were received, after a large technology purchase had been made. DOA was also to report the rationale for the selection of the bid that was chosen.

23.   Despite assurances that he had addressed every issue of concern to the Governor's staff and despite the benefit to Arizona taxpayers, SB1434 was promptly vetoed.

24.    Senator Shooter introduced the bill again the next session and notwithstanding attempts to work with the State CIO Morgan Reed, he was informed by representatives of the Governor's Office that it would again be vetoed.

25.    Senator Shooter was frustrated that he could not find common ground with representatives of the Governor's Office to create consistent transparency and competition.

26.    It must be noted that Mr. Shooter does not believe nor has he found any evidence that Governor Ducey was in anyway involved in or aware of Mr. Shooter's concerns and the related conduct of Adams and Mesnard and others as detailed herein.

27.    Senator Shooter continued his efforts despite harassment from defendants.

28.    These incidents of harassment occurred consistently within days of directly communicating opposition to uncompetitive procurement practices to the Governor's Chief of Staff Kirk Adams.

29.    For example, in the midst of the legislative session and five days after warning the Governor's Chief of Staff Kirk Adams and other high-level Governor staff members that he would not tolerate the state entering into and maintaining multi-million dollar contracts without competition, Senator Shooter was surveilled and followed by a private investigator.

6

30. After realizing that a stranger was following his every move including to following him home, Senator Shooter sought intervention from the Arizona Department of Public Safety (DPS) out of concern for his safety and that of his family.

31. DPS identified the person surveilling him as a private investigator and made contact with the P.I. who told DPS to speak with his attorney. The P.I.'s attorney confirmed that the P.I. was conducting surveillance.

32. Each time that Mr. Shooter voiced his objections to the Governor's Chief of Staff Kirk Adams, within days, Dennis Welch, a local television reporter would show up at the Legislature with a camera man and aggressively follow and film Mr. Shooter, then run a story derisive of Mr. Shooter.

33. The timing of Welch's appearances was so consistent, that Mr. Shooter suspected collaboration between Mr. Welch and Mr. Adams.

34. In the summer of 2017, in his capacity as Chairman of the Joint Legislative Budget Committee (JLBC), Mr. Shooter was instrumental to enabling the AZ Department of Administration proceed with the purchase of software for its agency that would provide robust auditing of procurement services provided by the agency.

35. Representative Shooter was told by the Arizona Department of Administration's Director at the time, Craig Brown, that permitting the state's conversion from its existing procurement software vendor, Periscope to an alternative procurement software vendor called Valuea, via a new competitively bid contract,

would stop some of the current, questionable and problematic practices at the Department.

36.     The existing procurement software company at the time, Periscope, lost its contract with the state following Representative Shooter's efforts in the committee he chaired (JLBC).

37.     Periscope was represented by Axiom, a lobbying firm that subcontracted lobbying duties with Brian Townsend, who, until recently, had worked for Kirk Adams in the Governor's Office. Also of significance, Brian Townsend was Representative Michelle Ugenti-Rita's fiancé.

38.     The state's transition from Periscope, the existing software procurement company Ugenti-Rita's fiancé Brian Townsend represented, to another company, ended the multi-year, multi-million dollar important and lucrative contract for Periscope.

39.     Almost immediately thereafter, Representative Ugenti-Rita's fiancé Brian Townsend's representation of Periscope was terminated.

40.     Just as Mr. Shooter escalated his efforts, the retaliation escalated following a private meeting, November 2, 2017.

41.     In that November 2, 2017 meeting between then Representative Shooter and the Governor's Chief of Staff Kirk Adams, Representative Shooter point blank told Adams that he planned to use his subpoena power, granted to him as Chair of the House Appropriations Committee, to gain additional insight into the irregularities in

the procurement process at the start of the next legislative session unless there was some movement to address the continued improper use of expensive, no bid contracts. Mr. Shooter explained however, he'd much prefer the Governor's Office "clean-up their own house".

42.   This was Mr. Shooter's twentieth and final attempt to push the Governor's Office to address brazen procurement process deficiencies without having to issue subpoenas and conduct hearings.

43.   If it was not clear before, it was made clear in that meeting: Mr. Shooter was never going to stop his efforts to bring state procurement, and the procurement no-bid process to light and obtain systemic reforms to require competition.

44.   At or around the time of Mr. Shooter's expulsion, the director of procurement at the Arizona Department of Administration was terminated.

45.   Kirk Adams, as confirmed directly by media, leaked an internal memorandum from DOA addressed to Adams detailing alleged issues relating to Ashoke Seth's job performance prior to the state's termination of Seth's employment.

46.   This internal memorandum was disclosed in direct contravention of the state's human resource practices, which prohibits such public disclosure.

47.   The memo was never included in Ashoke Seth's personnel file and Ashoke was never made aware of the memo prior to its public release nor provided the opportunity to refute its assertions, contrary to state personnel practices.

48.     Ashoke Seth filed for protection under the state's whistle blower status and detailed "mismanagement, abuse of authority, a gross waste of monies and a violation of laws" by representatives of the Arizona Department of Administration citing several questionable technology contracts.

49.     Seth's claims were supported by other DOA employees including but not limited to the former DOA director Craig Brown.

50.     Ashoke Seth's whistle blower claim did not prevail yet many of the facts he described relating to technology contracts and questionable payments were not disputed.

51.     Similarly, following the expulsion of Mr. Shooter, Mr. Shooter received an anonymous, extremely well researched and verifiable set of documents that contained previously unknown details of alleged corruption and criminal conduct involving technology contracts at DOA.

52.     In the cover page of the letter from the anonymous source to Mr. Shooter, the source encouraged Mr. Shooter to continue his efforts to expose the corruption and hoped the enclosed, additional documentation of specific no-bid contracts and the activities undertaken by alleged criminal actors would be the proof Mr. Shooter needed to put a stop to the corruption.

53.     This anonymous letter and the enclosed supporting documentation was also received by an attorney for Mr. Shooter, Kraig Marton.

**C.     Early Efforts to Discredit Representative Shooter**

10

54.   On November 7, 2017, five days after Representative Shooter's meeting with Kirk Adams, Dennis Welch interviewed Brian Townsend's fiancé Representative Michelle Ugenti-Rita.

55.   Welch collaborated with Ugenti-Rita and promoted and broadcast his television interview with her that misconstrued Ugenti-Rita's past friendship with Representative Shooter, as the basis for allegations of past sexual harrassment by Representative Shooter.

56.   Brian Townsend was not only Michelle Ugenti-Rita's fiancé, he had recently worked for Kirk Adams in the Governor's Office and was also Kirk Adams' former Senior Policy Adviser when Adams previously served as Speaker of the House.

57.   Upon information, these actions were taken at the direction of Adams in a further and intensified attempt to dissuade Representative Shooter from his efforts to bring fair dealing and transparency to the state procurement processes.

58.   Soon after Representative Ugenti-Rita's media interview, the Speaker began the process, in coordination with Adams and another member of the Governor's Office, of inhibiting and discrediting Representative Shooter.

59.   All activities of Mesnard, described below, were a result of his agreement with Adams and another member of the Governor's Office.

60.   Within days of Representative Ugenti-Rita's allegations, the Speaker began pressuring Representative Shooter to resign despite the fact that Representative

11

Shooter would shortly face the voters of his district in an election that was only months away.

61.    The Speaker's requests for resignation made clear that  he was not an impartial arbiter.

**D.    Representative Shooter Asks for An Ethics Investigation**

62.    With nothing to hide and in furtherance of his priority of transparency, on November 8, 2017, Representative Shooter asked for a complete investigation into the allegations against him.

63.    At the same time, Representative Shooter asked the House to investigate allegations that had surfaced concerning malfeasance and sexual misconduct by Representative Ugenti-Rita.

64.    Mr. Shooter believed that once complete, the investigative report would be turned over to the Ethics Committee whose members had not publicly or privately weighed in. The House Ethics Committee was, without exception the tradition as well as the parliamentary and procedural norm and expectation for all such matters. To be clear, it is the Constitutional right of every state legislature and Congress to expel an elected member of its chamber. But it is also clear, that such a vote cannot and must not occur without the elected member afforded due process.  In fact, on January 28, 2019, representative Kelly Townsend, the representative who actually made the motion to expel Representative Shooter, stated on the Floor of the House "in retrospect it was the wrong process" to remove Representative Shooter without an

ethics hearing. Exhibit 9. Other Representatives made similar statements.

65.     Those two principles are not in conflict and are, in fact, complementary. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978)." Representative Shooter alleged violations of law and existing House policy by Representative Ugenti-Rita when she repeatedly sexually harassed a direct subordinate.

66.     Mr. Shooter also alleged that Representative Ugenti-Rita, while married, carried on an  affair with an additional subordinate House staff member.

67.     Mr. Shooter requested the House complete a thorough investigation into those allegations, as well as Ugenti-Rita's allegations against him.

68.     Instead of the never deviated from tradition that was the parliamentary and procedural norm and expectation of an investigation by the House Ethics Committee, the Speaker appointed a hand-selected committee *of his staff* to investigate the allegations regarding the two House members, Shooter and Ugenti-Rita.

69.     The Speaker then suspended Representative Shooter from his position as Chairman of the House Appropriations Committee.

70.     In a news release, Mesnard announced that he had suspended Representative Shooter from his responsibilities as Chairman of the House Appropriations Committee. Mesnard rationalized "I don't believe he [Shooter] can

13

properly fulfill his obligations as Chairman of the House Appropriations Committee until the investigation is concluded."

71.     The effect of this reprisal was to immediately eliminate Mr. Shooter's authority to issue subpoenas.

72.     On or about November 15, 2017, that House investigative team, comprised only of staff members selected by the Speaker, retained the private law firm of Sherman and Howard as independent investigators to conduct the investigation.

73.     Sherman & Howard was hired to conduct a factual investigation.

74.     Sherman & Howard was paid by taxpayer dollars to investigate, not litigate allegations of sexual misconduct.

75.     Sherman & Howard has refused to provide a copy of the retainer agreement or documents setting forth their relationship despite requests from multiple parties including Mr. Shooter.

76.     Despite the fact that Representative Ugenti-Rita was subject to the House independent investigation, and despite the fact that she served as Chair of the House Ways and Means Committee, Mesnard refused to apply the same standard to both members investigation and suspend Representative Ugenti-Rita from her position as Chair of her Committee or return Representative Shooter to his chairmanship.

77.     Further demonstrating the disparate treatment applied throughout the investigation, unlike his treatment of Shooter, Mesnard indicated that making any pre-

14

determinations before the investigation of Ugenti-Rita was complete would be premature.

78.     Privately and repeatedly, Speaker Mesnard requested Representative Shooter resign.

79.     Contrary to the Speaker's assertion that it would be premature to reach any conclusions prior to the conclusion of the investigation, by his actions, he made clear that he was biased by pronouncing Representative Shooter unable to serve as a committee chair yet not applying the same procedure to Representative Ugenti with respect to her chairmanship.

80.     Mesnard further determined that the investigation was insufficient to taint Representative Ugenti-Rita in any way, despite a written request made public by members of his caucus asking that he treat members consistently. He did not intervere with Ugenti-Rita's continued chairmanship of her committee.

81.     The disparate and preferential treatment of Representative Ugenti-Rita was steadfast throughout the investigation.

82.     Another example of Mesnard's bias against Representative Shooter and the special treatment of Ugenti-Rita related to Mesnard's decision to pay a "capped" amount of the attorneys' fees for the three legislators under investigation. (Soon after claims against Representatives Ugenti and Shooter were made, an ethics complaint which included allegations of sexual misconduct, was filed against Representative

Rebecca Rios making her the third legislator under investigation by the independent investigator).

83.     The Speaker contacted Representative Shooter and informed him of his decision to pay a portion of all three legislators' attorneys' fees then immediately requested Representative Shooter not accept the offer.

84.     All three legislators submitted invoices from their attorneys, each in excess of the capped fee amount. Notably, the Speaker paid 25% more to the attorney representing Representative Ugenti-Rita than Mr. Shooter's or Ms. Rios's.

**E.      Representative Shooter Responds To His Wrongful Chairmanship Removal**

85.     Representative Shooter attempted to redress this disparate treatment on his own. He hired counsel Daniel Pasternak to request a fair process.

86.     Mr. Pasternak contacted the investigator, Craig Morgan, via letter dated January 4, 2018 to urge that Representative Shooter be returned to his position as Committee Chair.

87.     Representative Shooter was attempting to ensure that the procedures were evenly applied.

88.     Pasternak encouraged the Speaker to treat both Ugenti-Rita and Shooter consistently by allowing them to both retain their positions as chair of their respective committees.

89.   Mesnard's response in a letter contained one word: "No" with no explanation.

F.   **Mesnard Changes The Rules**

90.   The House has long had policies regarding equal treatment in the workplace. Yet, the Speaker created a substantially more restrictive policy which he directed to only be applied to Representative Shooter.

91.   Mesnard's policy, created at the time Ugenti-Rita made allegations of sexual harassment, was never voted on and remains unadopted by the elected members of the House though, was required to be voted on and adopted before applying to any elected members under House Rule.

92.   The Speaker lacked the authority and violated the House Rules when he unilaterally created a separate policy that he applied to only one of three members accused and investigated, in the same month by the same independent investigator, for misconduct.

93.   This separate policy was provided by the Speaker to the House's independent investigator to assess allegations against Representative Shooter.

94.   This policy (which is referred to in the independent investigators' report as "the Policy") was created, adopted in November 2017 and enforced, unilaterally by the Speaker. The Speaker lacked the authority to unilaterally adopt a new policy for elected members of the House under existing House Rules.

95.     The new, proposed policy was announced only after Ugenti posted allegations on Facebook.

96.     In the history of the United States, all serious allegations of misconduct against a member of the Arizona Legislature, by tradition as well as parliamentary and procedural expectations, have been handled by a committee of elected peers such as a "Special Committee" or an Ethics Committee (with one exception described below that took place during the Civil War for United States senators who abandoned the senate and joined the rival, Confederate government that was at war with the United States).

97.     No Legislature in Arizona history, has attempted the expulsion of a member without convening a special or ethics committee consisting of elected members.

98.     No Legislature in Arizona, has expelled a member without providing this and other basic elements of fair disciplinary processes.

99.     Based on exhaustive research, it is alleged that there has not been one expulsion of an elected member by a state legislature *in the history of the United States* prior to Representative Shooter's, without the involvement of a chamber's special committee (known throughout the history of the states and the United States Congress) by a variety of names such as the "Select Committee", "Conduct Committee", "Ethics Committee", "Standards & Official Conduct" and "Special Privilege & Election Committee) consisting of elected members, not members of hand-picked staff under

the employ of the Speaker, as was the case in Representative Shooter's expulsion process. One notable exception was during the Civil War when Congressional members did not return to Congress and instead joined the Confederate government. Given their abandonment of their duties in Congress to serve a rival government, at war with the United States and their failure to personally appear in Congress, a committee hearing was not necessary. These extraordinary facts have no similarity to the circumstances that were used to justify Mr. Shooter's removal from office.

100.   Had the House Ethics Committee evaluated the allegations against Representative Shooter, applying the existing House rules and the existing House and Senate policies, the allegations against Representative Shooter would have been measured against entirely different policies and the outcome would have been entirely different.

101.   Such was the outcome for Representative Rebecca Rios who was alleged to have engaged in sexual relations with a young House staff member before being discovered by another staff member in the basement of the House which was reported to the representatives of the Speaker's office at the time and led to the staffer's dismissal from employment in the House.

102.   Although direct information provided in a briefing during the transition from the previous speaker to Mesnard giving Mesnard first-hand knowledge and also known first-hand by another member of House leadership, Kelly Townsend when Mesnard was speaker, the complaint was dismissed.

103.   The Rios dismissal letter cites a lack of first-hand knowledge as well as a finding that the issue does not amount to a violation of law, rule or policy.

104.   A.R.S. §38-519 establishes an Ethics Committee for each legislative body, comprised of five Members appointed (in the House) by the Speaker.

105.   The House Ethics Committee is to investigate complaints and charges against members of the House, and "if necessary report the results of the investigation to [its house] with recommendations for further action."

106.   This Ethics Committee (and prior to its formation in the Arizona Legislature, the "Special Committee") has in Arizona presided over every serious allegation of misconduct by a member, including after legislators (during AZScam in 1991) who were videotaped accepting and, in one case even counting the money for, bribes and whose bank accounts had already been confiscated in a separate, yet related civil racketeering lawsuit.

107.   Even the AzScam legislators required basic due process which included the opportunity for a hearing which Mr. Shooter was intentionally deprived of.

108.   The *Arizona Capitol Times* wrote, in a retrospective article printed 9/19/2011, "The ethics trial format [for Walker and Higuera] was fairly simple and was set to feature opening arguments from opposing sides, the presentation of witnesses and documents, cross-examinations and follow-up questions from the special prosecutor. Committee members were allowed to question witnesses".

109.   A second example involves Jesus "Chuy" Higuera (1991).

110.   Mr. Higuera resigned in the midst of the House Ethics Committee investigation. The House Ethics Committee investigation was conducted simultaneously with the Senate Ethics Committee investigation into Senator Carolyn Walker.

111.   A third example is Sue Laybe (1991).

112.   Ms. Laybe resigned on the third day of her House Ethics Committee hearing into her role in "AZScam".

113.   A fourth example is Senator Scott Bundgaard (2012) which occurred while Ugenti-Rita, Mesnard and Shooter all served in the Legislature and thereby reinforced House and Senate historical precedent while all three legislators personally observed legislators' rights to due process.

114.   Mr. Bundgaard resigned, following witness testimony, a few hours after the start of the Ethics Committee hearing.

115.   A fifth and the most recent example, again occurred while Ugenti-Rita, Mesnard and Shooter all served in the Legislature is Representative Daniel Patterson (2012).

116.   The Ethics Committee's Investigative Report made clear "the Chairman [of Ethics] shall review and distribute a copy of each complaint and supporting documentation to all Members of the Committee and to the Member who is the subject of the complaint. The Member who is the subject of the complaint shall have the opportunity to respond to the complaint in writing". *Emphasis added*

117.   After the House Ethics Committee recommended expulsion but before a floor vote by all legislators, Mr. Patterson resigned.

118.   By serving in the legislature at the time during which allegations of misconduct were investigated and required an Ethics Hearing in a committee of elected peers, the historical norm was modeled for Mesnard, Ugenti-Rita and Shooter and reinforced expectations of due process.

119.   This process is affirmed by the National Council of State Legislatures (NCSL) which extensively tracks state legislatures, in "Inside the Legislative Process", a nationally-recognized publication and research tool which collects responses to comprehensive surveys of legislative clerks and secretaries of all 50 state legislatures, "Modern court cases establish that a legislator who is subject to disciplinary proceedings has the right to due process".

120.   For the first time in the Arizona Legislature's history, rather than convene the Ethics (or Special) Committee to evaluate conduct complaints against members Representative Shooter and Representative Ugenti-Rita, the Speaker appointed a "special investigation team" consisting only of his staff and not of elected members/peers as was required by tradition as well as the parliamentary and procedural norms and expectations. At the direction of Mesnard, his staff member team promptly hired Sherman & Howard to conduct an independent investigation.

121.   Representative Shooter never requested that the House *hire* outside counsel to conduct an investigation.

122.    Representative Shooter did not request Sherman & Howard determine whether the allegations were true. At all times, Mr. Shooter expected the evidence to be thoroughly evaluated by his elected peers with his opportunity to address each allegation in the Ethics Committee.

123.    The Speaker of the Arizona House of Representatives does not have the authority to:

o       Unilaterally create a new sexual harassment policy for elected members without a vote of the elected members;

o       Direct that a new, "zero-tolerance", subjective policy enforced in direct contravention of House Rules and be enforced **retroactively** on any elected member for alleged offenses, many of which were alleged to have occurred seven years prior;

o       Direct the use of two distinct and vastly inconsistent policy standards simultaneously to elected members to members under investigation at the same time by the same investigator;

o       Cause the independent investigators' report to **omit material and exculpatory testimony and evidence** relating to independently corroborated, serious allegations of sexual misconduct by Ugenti-Rita, Mr. Shooter's accuser;

o       Compel the members of the House to vote for its first expulsion in 70 years only four days after the release of the investigators' report without providing Mr. Shooter the opportunity to respond in writing nor the opportunity to meaningfully

defend himself in a hearing before his peers. Mr. Shooter was assured both orally and in writing during the investigation and on the day the report was made available to the public that he was entitled to five days to provide a written response to the investigative report. The investigative report contains multiple factual errors and amounts to an outline of allegations of facts, only the first step in a fair process. Four days after Mesnard's release of the report, Mesnard concluded Mr. Shooter should be sentenced to expulsion and offered the motion to expel. This conduct is evidence of Mesnard's unambiguous intention to preclude Mr. Shooter from the opportunity to raise these consequential issues *until after he had been expelled* which is the purpose of this complaint.

124.   The Policy enforced on Representative Shooter, commonly referred to as the "zero tolerance policy" was created *and effective November 2017* and as of the date of this filing still may not be enforced on **any legislative member** without a vote to adopt the policy.

125.   For the zero tolerance, subjective, retroactive policy to be enforced on legislative members, a vote by the legislative members approving the policy was required. Yet no such vote on the policy ever took place.

126.   The independent investigators were directed to impose Mesnard's newly created, illegitimate policy, retroactively, to form conclusions about violations of this new, unauthorized policy.

127.  As stated in page six of the report, "the investigation was conducted in light of the House's very expansive zero tolerance Policy, as opposed to whether someone might be able to state and prove a claim for workplace harassment, discrimination or hostile work environment in a court or administrative proceeding" yet, again, the speaker lacked the authority to create and require a new policy be applied on a member without the prior approval of the legislative membership.

128.  No explanation has been given for considering alleged conduct from prior legislative terms, most alleged to have occurred while Representative Shooter was serving in the Senate, using rules only created after the allegations were made and which, again, were never authorized by elected members of the House as was expressly required for enforcement, according to existing House Rule.

129.  The selective enforcement of Mesnard's unauthorized, newly created policy combined with the intentional exclusion of exculpatory evidence directly resulted in the conclusions by the independent investigators, using employment law terminology yet with an infinitely lower, subjective standard than would be applied under employment law, that Mr. Shooter's conduct (without the opportunity to address factual and legal inaccuracies as promised and required) created a "hostile work environment", was the core rationale used to justify his expulsion.

130.  Moreover, if Mesnard's newly created policy had been applied to Mesnard's own conduct, he would have been in direct violation of his retroactive policy. Mesnard commenced a romantic relationship with a state agency's "legislative

liaison" at the time she was lobbying him. He voted on her legislation without recusing himself on votes affecting her agency. On more than one occasion, Mesnard accompanied his paramour to hearings and sat with her in the audience, visible to all legislative members of the committees, when his paramour testified on legislation affecting her agency.

131.   If the existing, appropriate House and Senate policies at the time had been applied, which evaluated conduct using the employment law legal standard, Mr. Shooter would have been found to have made offensive attempts at humor, in instances one time in front of separate individuals, but not to have created a hostile work environment.

132.   Without due process, Mr. Shooter's peer legislators were denied the time, opportunity and information to objectively evaluate the facts, evidence and appropriate policies nor hear Mr. Shooter's responses and rebuttals.

133.   These breaches of specific House Rules and parliamentary and procedural tradition and expectations violated the basic rights owed to Mr. Shooter, as a citizen, and as a duly-elected member of the Arizona House of Representatives and owed to the people of his legislative district who elected him.

134.   These extraordinary measures were undertaken to prevent Representative Shooter from issuing subpoenas and thereby making evident, high-level corruption.

### G.   Independent Investigator's Report was Materially Modified

135.   The independent investigators' report contains voluminous discussion regarding various allegations against Representative Shooter. In fact, some 65 pages of the 75 pages of the investigative report were dedicated to the investigation into claims made against Mr. Shooter, including interviews with numerous witnesses and in some instances, where their allegations were found to be demonstrably false.

136.   According to the report, <u>a majority of the claims against Mr. Shooter were found not to constitute sexual harassment</u> even under the Speaker's specially created, strict "zero tolerance" standard.

137.   By contrast, the report contains only a page and a half directed to allegations against Representative Ugenti-Rita and concludes, without facts or analysis, that there is "no credible evidence" that she violated the Policy.

138.   This finding, despite the fact that a known victim of repeated sexual harassment by Representative Ugenti-Rita came forward to the independent investigators and provided her testimony, physical evidence and corroborating, contemporaneous witnesses to the sexual harassment is dubious.

139.   The testimony and evidence of sexual misconduct by Ugenti-Rita was far more egregious than any allegation against Mr. Shooter yet were intentionally excluded from the final and public report.

140.   The Speaker caused the credible testimony of Ugenti-Rita's victim and her two corroborating, contemporaneous witnesses as well as the physical evidence to be excluded from the publicly released version of the report.

141.   There was no attempt to discipline or otherwise censure Representative Ugenti-Rita, as the Speaker's objective was, in concert with the Governor's Chief of Staff Kirk Adams, in collaboration with another member of the Governor's staff, only to end Representative Shooter's attempts to uncover evidence of corruption related to high priced no-bid contracts and other non-competitive procurement processes.

## H.   The Independent Investigator's Report Was Not Independent

142.   At the conclusion of the independent investigation, the results were initially withheld from the public and Mr. Shooter. The Speaker received a copy of the independent investigator's report approximately nine days before he released the version of the report he deemed final to the public.

143.   The direct testimony of a victim of sexual harassment by Representative Ugenti-Rita and supporting witness testimony and evidence were intentionally excluded from the report that was released to Mr. Shooter and the public.

144.   When witnesses were interviewed by the independent investigators Morgan and Hesketh, witnesses were told expressly, that their statements and the information obtained in their interviews were not protected.

145.   There are numerous citations in the report to interviews with anonymous "Interviewees" and to notes, photos, and other evidence that have never been provided to Representative Shooter despite repeated requests.

146.   The decision to exclude exculpatory witness testimony and related evidence had a deleterious impact on Representative Shooter's ability to respond to the charges and to challenge the credibility of his accuser, Representative Ugenti-Rita.

147.   The Speaker has refused to release evidence, obtained and documented by the independent investigator, of wrong doing by Ugenti-Rita despite the fact that the investigation and evidence was obtained on behalf of the House of Representatives with the use of Arizona tax dollars in an effort for alleged transparency and fairness to the public. To date, Mesnard has authorized payments totaling over $250,000 to the investigators to meet with witnesses, document, make revisions and now recent efforts to stymie requests for the release of all relevant and materially related testimony.

148.   Considerable information was not available to the general public or to members of the House of Representatives at the time that the report was released. Material information was not made available to House members at the time of Mesnard's motion and the House vote to remove Representative Shooter from elected office.

149.   A month after the vote to expel Mr. Shooter, Mesnard, after repeated requests by media under public records law, released an additional 340 pages of

documents, related solely to the investigation of Mr. Shooter yet nothing related to claims against Representative Ugenti-Rita (on March 16, 2018).

150.   The victim testimony, testimony from two additional, contemporaneous witnesses and physical evidence, obtained by the independent investigator, that directly relates to the credibility of Ugenti-Rita who announced on Facebook and on television that she was victimized, and on information, exculpatory information known to the independent investigators was (and remains) hidden from the public intentionally so as to not impede the plan set in motion to destroy his reputation and immediately expel Representative Shooter.

151.   Though, Mr. Shooter is aware that the investigation received or had access to photographs of a private nature,  at no time has he sought to obtain such photographs nor make the photographs public.

152.   Although, according to the Report, there were "interviews with over 40 individuals" (p. 3 of the report), the House and Sherman & Howard has refused to provide even the identity of those witnesses.

153.   Mr. Shooter does not seek to require the victim of sexual harassment by Ugenti-Rita to again provide her testimony when the victim already provided her detailed testimony to Sherman & Howard investigators which was documented. Mr. Shooter seeks to spare the victim and her corroborating, contemporaneous witnesses from the need to come forward and present testimony a second time. Mr. Shooter has demonstrated this priority to spare this victim from having to once again present

30

testimony by requesting, repeatedly the House and Sherman & Howard to admit the existence of witnesses against Ugenti-Rita that were excluded from the report and to provide the witnesses statements as given to the independent investigators. Furthermore, Mr. Shooter does not wish to make their identities public without their express permission.

154.   When interviewed by the *Phoenix Business Journal* in April 2018 about his work investigating sexual harassment claims, including the Shooter & Ugenti investigation, the lead investigator for the House, Craig Morgan of Sherman & Howard advised " . . . the most important part of harassment investigations is getting to the truth and having due process for all involved. That means taking allegations seriously and dealing with them accordingly, if true."

155.   "To find the truth was the most important thing," Morgan said of the Shooter investigation.

156.   Mr. Shooter is in agreement with Mr. Morgan's recommendations and therefore seeks due process, requests that Ugenti-Rita's victim's allegations are taken seriously and dealt with accordingly. This can only be achieved by the full and open disclosure of the sexual harassment and true victimization of Ugenti-Rita's direct subordinate, a young staff member formerly under Ugenti-Rita's direction in the Arizona House of Representatives.

## II.   GENERAL LEGAL BASES FOR SHOOTER'S CLAIMS

157.   Mr. Shooter has been damaged by the actions and inactions of the Defendants.  He has suffered violations of his Constitutional rights and has been the victim of common law torts.  His constitutional rights under both the United States and Arizona constitutions have been violated. His rights to due process, equal protection, and to confront and cross examine his accusers were breached.

158.   The Arizona violations include the failure to provide due process as required under the Arizona Constitution. Representative Shooter was discriminated against when Mesnard unilaterally, retroactively and without authority applied a "zero tolerance" subjective policy solely to Mr. Shooter, a violation also of House Rules which necessitated members to vote on the adoption of the "zero-tolerance" policy. Speaker Mesnard intentionally violated House Rules when he submitted the specially constructed, never adopted policy to be applied retroactively. This is evidenced by the fact that after Mr. Shooter's expulsion, Mesnard failed to seek nor obtain the approval of members to adopt any Code of Conduct, let alone the subjective, "zero-tolerance", retroactive policy he created then claimed was violated which required that Mr. Shooter be expelled from office.

159.   The allegations against Representative Shooter were made at the time Mesnard introduced a proposed policy for members and which will never be voted on let alone adopted by the legislative members which was required under House Rule.

160.   It is a violation of Representative Shooter's Constitutional rights for Mesnard to create a new, unadopted policy to apply to alleged actions dating back as far as 2011.

161.   The same factual predicate outlined above is evidence that Mesnard, in his leadership position acted in concert to violate Representative Shooter's due process rights and to deny him the privileges and immunities granted to him as a citizen of both Arizona and the United States.

162.   Representative Shooter's right to due process includes the Constitutional right to examine his accusers and confront the witnesses against him.

163.   Although the expulsion of Representative Shooter is not a judicial proceeding, the House vote to expel him was to deprive him of his seat in the House of Representatives, which was a property right to which he was deprived without due process of law.

164.   The entire removal process was undertaken without the protections of the traditional Ethics Committee or any of the rights the Courts find so important.

165.   At a bare minimum, Representative Shooter should have been provided access to the complete investigative file including the investigators' notes describing the testimony of material witnesses so that he could properly mount a defense to the allegations raised against him.  He should, at the very least, have had timely access to the information in order to question the bias, interest, and motive of his accusers.

166.   He was denied that right by Mesnard's decision to release only the redacted 82 page report. Representative Shooter was wrongfully terminated from his position as Representative of legislative district 13.

167.   Expulsion from a state legislature without due process is an important and ripe issue for Arizona's Courts. Just a little over a month after the Arizona Speaker bypassed long established procedural and parliamentary norms and expectations for a fair disciplinary process and Representative Shooter became the first state legislator in the United States to be expelled without the matter considered by an ethics or special committee of his peers, Colorado followed suit and expelled a lawmaker also without first providing the protections required for due process.

168.   Notably, the legislature requires a committee hearing before a bill may progress to a floor vote. It seems a minimal expectation that before a legislator is expelled from office, a hearing is first necessitated.

169.   To be clear, it is the Constitutional right of every state legislature and Congress to expel an elected member of its chamber. But it is also clear, that such a vote cannot and must not occur without the elected member afforded some due process. Those two principles are not in conflict and are, in fact, complementary. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978)."

170.  It is a fundamental American principle, embraced to distinguish our system of justice from a monarchy. At its core, due process is notice and an opportunity to be heard by an impartial tribunal.

171.  Procedural rules "minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests. *Fuentes v. Shevin*, supra, 407 U.S. 67, 81 (1972).

172.  In *United States v. Ballin*, 144 U.S. 1, 5 (1892) the Supreme Court held that, while the House's rulemaking power was broad, in exercising that power, the House "may not by its rules ignore constitutional restraints or violate fundamental rights. It would seem that the same limit may be applicable to the expulsion power".

## ADDITIONAL LEGAL BASES OF THE CLAIMS

173.  There is no question that the Supreme Court can and will intervene when other branches of state government act improperly. In the case of *Arizona Indep. Redistricting Comm'n v. Brewer*, 229 Ariz. 347, 275 P.3d 1267 (2012), the Court found the governor did not have the power to remove a member of the Independent Redistricting Commission. In doing so, the Court made some applicable observations:

> The gubernatorial removal power derives from the Constitution, not statute. That fact, however, does not alter or lessen a court's power to review whether removal of an independent commissioner meets constitutional requirements" (229 Ariz. at 354, 275 P.3d at 1274)

174. Well-established legal principles exist to guide us in determining whether the Governor's removal of Mathis meets constitutional requirements, without 'substituting our subjective judgment' on facts or on the nature and severity of Mathis's alleged wrongs." (229 Ariz. at 354, 275 P.3d at 1274).

175. "The requirement of two-thirds Senate concurrence is a significant check on the governor's removal power and poses a potentially formidable hurdle to curb abuse of executive discretion. *353 **1273 But the absence in Section 1(10) of the other procedural and substantive safeguards found in Article 8 distinguishes the Senate's role under Section 1(10) from its role in an impeachment." (229 Ariz. at 352–53, 275 P.3d at 1272–73).

176. "To determine whether a branch of state government has exceeded the powers granted by the Arizona Constitution requires that we construe the language of the constitution and declare what the constitution requires. The interpretation of the laws is the proper and peculiar province of the courts and a constitution is and must be regarded by the judges as fundamental law. It is emphatically the province and duty of the judicial department to say what the law is." (229 Ariz. at 355, 275 P.3d at 1275)(internal cites and punctuation omitted).

177. Although the expulsion of Representative Shooter is not a judicial proceeding, the clear intent of the House vote to expel him was to deprive him of his seat in the Arizona House of Representatives. As the Supreme Court said in *Greene v. McElroy*, 360 U.S. 474, 496— 497 (1959):

36

Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment. This Court has been zealous to protect these rights from erosion. In January 2018, the Congressional Research Service published "Expulsion of Members from Congress: Legal Authority and Historical Practice". The authors note that there are very few court decisions on the use of the Constitution's Expulsion Clause.

178.    When considering this issue, due to the lack of specific judicial guidance, the Congressional Research Service asserts there is strong legal precedent to look to historical instances of the exercise of its power to interpret and guide the proper uses and constraints of the Expulsion Clause. https://fas.org/sgp/crs/misc/R45078.pdf.

## **COUNT ONE**

### **(Violation of Civil Rights and Aiding and Abetting And Conspiracy to Violate Civil Rights)**

179.    The actors, described above, were acting, singularly or in concert, under color of state law.

37

180.   Pursuant to 42 USC §1983 the coordination and actions taken and taken in concert by the Speaker and Adams, and the unconstitutional implementation of policies of the State constitute a violation of that Federal law.

181.   Section 1983 provides that no person acting under color of state law may act to deprive another of the rights and privileges granted to them under the laws of either Arizona or the United States Constitution.

182.   The actions of defendants deprived Shooter of his rights to due process and equal protection.

183.   The actions detailed above are sufficient to establish a violation of 42 USC § 1983 and entitle Representative Shooter to his actual damages in an amount to be proven at trial.

184.   The actions taken to expel Representative Shooter deprived him of a protected liberty interest. Representative Shooter lost his seat and was defamed at the same time. An individual who is terminated by the government has a protected liberty interest that is compensable if that individual is libeled at the same time. *Montoya v. Law Enforcement Merit System Counsel*, 148 Ariz. 108, 713 P.2d 309 (1985).

185.   Defendants aided and abetted each other and conspired to deprive Mr. Shooter of the his constitutional rights.

## COUNT TWO

### (Defamation and Aiding and Abetting, and Conspiracy to Commit Defamation)

186.   The allegations and opinions against Shooter which were evaluated applying a bogus policy, applied retroactively, and without the opportunity to respond to the investigators' report are defamatory and were publicly disseminated in the independent investigators' report and repeated as fact in the media. This report includes salacious information some of which even the independent investigator found not relevant. For example, on a number of the charges the independent investigator's report found that there was no credible evidence, and yet the House based its decision to expel Representative Shooter in part on the information contained in independent investigators' report.

187.   On information and belief, Defendants made defamatory statements to the press outside of legislative proceedings.

188.   Upon information, Defendants knew that the statements they were making were false or they acted in reckless disregard of the truth.

189.   Defendants are liable for this defamation, aiding and abetting and conspiracy to commit defamation.

190.   The State is liable under the doctrine of Respondeat Superior.

## COUNT THREE

### (False Light Invasion Of Privacy and Aiding and Abetting, and Conspiracy to Commit  False Light Invasion Of Privacy)

191.   The allegations presented in the independent investigators' report, and the intentional suppression of exculpatory information (which was suppressed at the

direction of Speaker Mesnard), and Defendants' statements to the press, place Representative Shooter in a false light.

192.   Defendants are liable for this false light invasion of privacy and aiding and abetting and conspiracy to commit false light invasion of privacy. The State is liable under the doctrine of Respondeat Superior.

## COUNT FOUR

### (Wrongful Termination)

193.   Representative Shooter was wrongfully terminated from his position of Representative of legislative district 13, resulting in loss of salary, fringe benefits, position, and most important, reputation. All defendants are liable for this wrongful termination.

Therefore, Plaintiff prays for damages against Defendants, and each of them, in a reasonable amount, for attorneys' fees, for costs incurred, for us and for such other and further relief as the court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

**THEREFORE**, Plaintiff prays that this Court:

(a)  Enter judgment against the defendants and each of them;

(b)  Enter a declaratory judgment declaring the acts of the defendant to be a violation of plaintiff's constitutional rights to freedom of speech, equal protection, and

due process and rights to public records;

(c)  Award plaintiff all damages, costs, interest and reasonable attorneys' fees for this action pursuant to 42 U.S.C. §1988 and other relevant statutes; and,

(d)  Order such other and further relief as the Court deems just and proper under the circumstances.

**DATED** January 29, 2019.

**HORNE SLATON, PLLC**

By: _____
Thomas C. Horne, Esq.
*Attorneys for Plaintiff*

1  Thomas C. Horne, Bar No. 002951
**HORNE SLATON, PLLC**
2  6720 North Scottsdale Road, Suite 285
Scottsdale, AZ 85253
3  Tel: (480) 483-2178
Fax: (480) 367-0691
4  Email: horne@horneslaton.com
*Attorney for Plaintiff*
5

6  # IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA

7  # IN AND FOR THE COUNTY OF MARICOPA

8

9  **DONALD M. SHOOTER**, an individual,

**CASE NO.**

10       Plaintiff,

11  vs.                          **EXHIBITS TO COMPLAINT**

12  **STATE OF ARIZONA;  KIRK and  JANAE**
13  **ADAMS**, husband and wife;  **JAVAN**
**"J.D." and HOLLY MESNARD**, husband
14  and wife,

15       Defendant.

16

17

| 1 | AWS Contract |
|---|---|
| 2 | Definition of Sole Source |
| 3 | Letter to ADOA Director re: procurement concerns |
| 4 | DPS Report – surveilled by private investigator |
| 5 | AZ Republic article re: subpoenas |
| 6 | Timeline of communications with Executive Staff |
| 7 | Rios Ethics Dismissal letter |
| 8 | Five days required for written response to report |

| 9 | Townsend quoted in  newspaper article |
|---|---|

# EXHIBIT 1

## AWS Enterprise Agreement

This AWS Enterprise Agreement (this "**Agreement**") is made and entered into by and between Amazon Web Services, Inc., a Delaware corporation ("**AWS**") and the customer specified on this Cover Page ("**Customer**").

In consideration of the mutual promises contained in this Agreement, AWS and Customer agree to all terms of the Agreement effective as of the date the last party signs this Agreement (the "**Effective Date**").

Defined terms used in this Agreement with initial letters capitalized have the meanings given in Section 13 below.

| Amazon Web Services. Inc. | Customer Name: State of Arizona |
|---|---|
| By: _Shannon Lowther_ | By: _____ |
| Name: BD4BA8F1C6DA41A... | Name: _Charlote Righeth_ |
| Title: _Authorized Representative_ | Title: _State Procurement Manager_ |
| Signature Date: March 14, 2017 | Signature Date: _3.10.17_ |
| | |
| Address: | Address: |
| | |
| 410 Terry Avenue North | 100 North 15th Avenue, Suite 201 |
| Seattle, WA 98109-5210 | Phoenix, AZ 85007 |
| Attention: General Counsel | Attention: _Charlotte Righeth_ |
| Fax: 206-266-7010 | Fax: _NA_ |

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28

legal

Page 1 of 11
AWS260389/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

1.    Use of the Service Offerings.

1.1    **Generally.** Customer may access and use the Service Offerings in accordance with this Agreement. Service Level Agreements may apply to certain Service Offerings. Customer will comply with the terms of this Agreement and all laws, rules, and regulations applicable to Customer's use of the Service Offerings.

1.2    **AWS Account.** To access the Services, Customer must create one or more AWS Enterprise Accounts. Unless explicitly permitted by the Service Terms, Customer will only create one AWS Enterprise Account per email address. All AWS Enterprise Accounts will be covered by this Agreement. For all AWS Enterprise Accounts, this Agreement supersedes any acceptance of the AWS Customer Agreement by Customer or any of its employees acting on behalf of Customer. If Customer opens any AWS accounts that do not meet the definition of an "AWS Enterprise Account," those accounts will be governed by the AWS Customer Agreement.

1.3    **Third-Party Content.** Third-Party Content may be used by Customer at Customer's election. Third-Party Content is governed by this Agreement unless accompanied by separate terms and conditions, which may include separate fees and charges.

1.4    **Customer Affiliates.** Any Customer Affiliate may use the Service Offerings under its own AWS Enterprise Account(s) under the terms of this Agreement by executing an addendum to this Agreement with AWS, as mutually agreed by AWS and the Customer Affiliate.

2.    Changes.

2.1    **To the Service Offerings.** AWS may change or discontinue any of the Service Offerings or change or remove functionality of any or all of the Service Offerings from time to time.



2.2    **To APIs.** AWS may change or discontinue any APIs for the Services from time to time. For any change or discontinuation of an API that is not also a discontinuation of a Service or a functionality of a Service, AWS will continue supporting the previous version of such API for 12 months after the change or discontinuation (except if doing so (a) would pose a security or intellectual property issue, (b) is technically infeasible, or (c) would prevent AWS from complying with the law or requests of governmental entities).

2.3    **To the Service Level Agreements.** AWS may change or add Service Level Agreements from time to time,

3.    Privacy and Security.

3.1    **AWS Security.** AWS will implement reasonable and appropriate measures for the AWS Network (as determined by AWS) designed to help Customer secure Customer Content against accidental or unlawful loss, access or disclosure

3.2    **Data Privacy.** Customer may specify the AWS regions in which Customer Content will be stored. Customer consents to the storage of Customer Content in, and transfer of Customer Content into, the AWS regions Customer selects. AWS will not access or use Customer Content except as necessary to maintain or provide the Service Offerings, or as necessary to comply with the law or a binding order of a governmental body. AWS will not (a) disclose Customer Content to any government or third party, or (b) subject to Section 3.3, move Customer Content from the AWS regions selected by Customer; except in each case as necessary to comply with the law or a binding order of a governmental body (such as a subpoena or court order). Unless it would be in violation of a court order or other legal requirement, AWS will give Customer reasonable Notice of any legal requirement or order referred to in this Section 3.2, to allow Customer to seek a protective order or other appropriate

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28



Page 2 of 11
AWS260389/2993075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

remedy. AWS will only use Account information in accordance with the Privacy Policy, and Customer consents to such usage. The Privacy Policy does not apply to Customer Content.

**3.3    Service Attributes.** To provide billing and administration services, AWS may process Service Attributes in the AWS region(s) where Customer uses the Service Offerings and the AWS regions in the United States. To provide Customer with support services initiated by Customer and investigate fraud, abuse or violations of this Agreement, AWS may process Service Attributes where AWS maintains its support and investigation personnel.

**4.    Customer Responsibilities.**

**4.1    Customer Accounts.** Except to the extent caused by AWS's breach of this Agreement, (a) Customer is responsible for all activities that occur under its AWS Enterprise Accounts, regardless of whether the activities are authorized by Customer or are undertaken by Customer, its employees or a third party (including without limitation contractors, agents or End Users), and (b) AWS and its Affiliates are not responsible for unauthorized access to Customer's AWS Enterprise Accounts.

**4.2    Customer Content.** Customer will ensure that Customer Content, Customer Submissions or Customer/End Users' use of Customer Content, Customer Submissions or the Service Offerings will not violate any of the Policies or any applicable law. Customer is solely responsible for the development, content, operation, maintenance, and use of Customer Content and Customer Submissions. For example, Customer is solely responsible for:

(a)    the technical operation of Customer Content, including ensuring that calls Customer makes to any Service are compatible with then-current APIs for that Service, including any APIs AWS continues to support under Section 2.2 of this Agreement;

(b)    any claims relating to Customer Content or Customer Submissions; and

(c)    properly handling and processing notices that are sent to Customer (or any Customer Affiliate) regarding Customer Content or Customer Submissions, such as by any person claiming that Customer Content or Customer Submissions violate such person's rights, including notices pursuant to the Digital Millennium Copyright Act.

**4.3    Customer's Security and Redundancy.** Customers have a variety of options to choose from when configuring their accounts, and for all sensitive or otherwise valuable content AWS recommends that Customer uses strong security and redundancy features, such as access controls, encryption, and backup. Customer is responsible for properly configuring and using the Service Offerings in a manner that provides security and redundancy of its AWS Enterprise Accounts and Customer Content, such as, for example, using enhanced access controls to prevent unauthorized access to AWS Enterprise Accounts and Customer Content, using encryption technology to prevent unauthorized access to Customer Content, and ensuring the appropriate level of backup to prevent loss of Customer Content.

**4.4    Log-In Credentials and Account Keys.** AWS log-in credentials and private keys generated by the Services are for Customer's internal use only and Customer may not sell, transfer or sublicense them to any other entity or person, except that Customer may disclose its private key to its agents and subcontractors (including any of its Affiliates who are acting as an agent or subcontractor of Customer) performing work on behalf of Customer.

**4.5    End Users.** Customer is responsible for End Users' use of Customer Content and the Service Offerings. Customer will ensure that all End Users comply with Customer's obligations under this Agreement and that the terms of its agreement with each End User are not inconsistent with this Agreement. If Customer becomes aware of any violation of its obligations under this Agreement by an End User, Customer will immediately suspend access to Customer Content and the Service Offerings by such End User, person or entity. AWS does not provide any support or services to End Users unless AWS has a separate agreement with Customer or an End User obligating AWS to provide support or services. Customer is responsible for providing customer service (if any) to End Users.

**5.    Fees and Payment.**

**5.1    Service Fees.** Unless otherwise stated on the AWS Site, AWS will invoice Customer at the end of each month for all applicable fees and charges accrued for use of the Service Offerings, as described on the AWS Site, during the month. Customer will pay AWS all invoiced amounts within 30 days of the date of the invoice (other than Disputed Amounts). For any Disputed Amounts, Customer will provide Notice to AWS, including the basis for the dispute

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28


legal

Page 3 of 11
AWS260369/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

(including any supporting documentation), and the parties will meet within 30 days of the date of the Notice to resolve the dispute. If the parties fail to resolve the dispute within such 30 day period, AWS may, at its option, (a) suspend Customer's or any End User's right to access or use any portion or all of the Service Offerings, immediately upon notice to Customer, and (b) terminate this Agreement pursuant to Section 7.2(b). All amounts payable by Customer under this Agreement will be paid to AWS without setoff or counterclaim and without deduction or withholding, provided that Disputed Amounts will be handled as set forth above. Fees and charges for any new Service or new feature of a Service will be effective when AWS posts updated fees and charges on the AWS Site, unless expressly stated otherwise in a Notice. AWS may increase or add new fees and charges for any existing Service by giving Customer at least 60 days advance Notice. AWS may elect to charge Customer interest at the rate of 1.5% per month (or the highest rate permitted by law, if less) on all late payments.

**5.2   Taxes.** Each party will be responsible, as required under applicable law, for identifying and paying all taxes and other governmental fees and charges (and any penalties, interest, and other additions thereto) that are imposed on that party upon or with respect to the transactions and payments under this Agreement. All fees payable by Customer are exclusive of Indirect Taxes. AWS may charge and Customer will pay applicable Indirect Taxes that AWS is legally obligated or allowed to collect from Customer. Customer will provide such information to AWS as reasonably required to determine whether AWS is obligated to collect Indirect Taxes from Customer. AWS will not collect, and Customer will not pay, any Indirect Tax for which Customer furnishes AWS a properly completed exemption certificate or a direct payment permit certificate for which AWS may claim an available exemption from such Indirect Tax. All payments made by Customer to AWS under this Agreement will be made free and clear of any withholding or deduction for taxes. If any such taxes (for example, international withholding taxes) are required to be withheld on any payment, Customer will pay such additional amounts as are necessary so that the net amount received by AWS is equal to the amount then due and payable under this Agreement. AWS will provide Customer with such tax forms as are reasonably requested in order to reduce or eliminate the amount of any withholding or deduction for taxes in respect of payments made under this Agreement.

**6.    Temporary Suspension**

**6.1   Generally.** AWS may suspend Customer's or any End User's right to access or use any portion of or all of the Service Offerings immediately upon Notice to Customer if AWS reasonably determines.

(a)    Customer's or an End User's use of the Service Offerings (i) poses a security risk to the Service Offerings or any third party, (ii) risks adversely impacting AWS's systems, the Service Offerings or the systems or Content of any other AWS customer, or (iii) risks subjecting AWS or its Affiliates to liability; or

(b)    Customer or any End User is not in compliance with the Acceptable Use Policy or Section 8 of this Agreement.

AWS will use commercially reasonable efforts to restore Customer's rights to use and access those portions of the Service Offerings or accounts that gave rise to the suspension promptly after Customer has resolved the problem giving rise to the suspension.

**6.2   Effect of Suspension.** If AWS suspends Customer's right to access or use any portion of the Service Offerings:

(a)    Customer remains responsible for all fees and charges Customer incurs during the period of suspension; and

(b)    Customer will not be entitled to any service credits under the Service Level Agreements for any period of suspension.

**7.    Term; Termination**

**7.1   Term.** The term of this Agreement will commence on the Effective Date and will remain in effect until terminated pursuant to this Agreement. Any Notice of termination of this Agreement by either party to the other must include a Termination Date.

**7.2   Termination.**

(a)    **Termination for Convenience.** Customer may terminate this Agreement for any reason by providing AWS Notice. AWS may terminate this Agreement for any reason by providing Customer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(b)    **Termination for Cause.**

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28


legal

Page 4 of 11
AWS260389/2923075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

(i)   **By Either Party.**  Either party may terminate this Agreement for cause if the other party is in material breach of this Agreement and the material breach remains uncured for a period of 30 days from receipt of Notice by the other party.

(ii)   **By AWS.**  AWS may also terminate this Agreement ▮▮▮▮▮▮▮▮▮▮ A) if there is an act or omission by Customer or any End User that AWS has the right to suspend for under Section 6 and, for those suspendable acts or omissions that are curable, Customer has not cured such condition within such 30 day period; or (B) in order to comply with applicable law or requests of governmental entities.

**7.3   Effect of Termination.**

(a)   **Generally.**  Upon the Termination Date:

(i)   except as provided in Section 7.3(b), all of Customer's rights under this Agreement immediately terminate;

(ii)   Customer remains responsible for all fees and charges Customer has incurred through the Termination Date;

(iii)   Customer will immediately return or, if instructed by AWS, destroy all AWS Content in Customer's possession (except for AWS Content that is publicly available on the AWS Site); and

(iv)   Sections 4, 5, 7 3, 8.1, 8.2, 8.4, 8.5, 9, 10, 11, 12 and 13 will continue to apply in accordance with their terms.

(b)   **Post-Termination Retrieval of Customer Content.**  AWS will not take action to remove any Customer Content as a result of the termination. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ AWS will allow Customer to retrieve any remaining Customer Content from the Services, unless (i) prohibited by law or the order of a governmental or regulatory body or it could subject AWS or its Affiliates to liability, or (ii) Customer has not paid all amounts due under this Agreement, other than Disputed Amounts.  For any use of the Services ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the terms of this Agreement will apply and Customer will pay the applicable fees at the rates under Section 5. ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Customer will close all AWS Enterprise Accounts.

**8.   Proprietary Rights.**

**8.1   Customer Content.**  As between Customer and AWS, Customer (or Customer's licensors) own all right, title, and interest in and to Customer Content.  Except as provided in this Agreement, AWS obtains no rights under this Agreement from Customer (or Customer's licensors) to Customer Content.

**8.2   Customer Submissions.**  Customer Submissions will be governed by the terms of the Apache License, Version 2.0, unless Customer requests and AWS consents in writing to another license supported by AWS.

**8.3   Service Offerings License.**  As between Customer and AWS, AWS, its Affiliates or its licensors own all right, title, and interest in and to the Service Offerings, and all related technology and intellectual property rights.  Subject to the terms of this Agreement, AWS grants Customer a limited, revocable, non-exclusive, non-sublicensable, non-transferrable license to do the following during the Term: (a) access and use the Services solely in accordance with this Agreement; and (b) copy and use the AWS Content solely in connection with Customer's permitted use of the Services.  Except as provided in this Section 8.3, Customer obtains no rights under this Agreement from AWS, its Affiliates, or their licensors to the Service Offerings, including without limitation any related intellectual property rights.  Some AWS Content may be provided to Customer under a separate license, such as the Apache License, Version 2.0, which will be identified to Customer in the notice file or on the download page, in which case that license will govern Customer's use of that AWS Content.

**8.4   License Restrictions.**  Neither Customer nor any End User may use the Service Offerings in any manner or for any purpose other than as expressly permitted by this Agreement.  Neither Customer nor any End User may, or may attempt to (a) modify, alter, tamper with, repair, or otherwise create derivative works of any Content included in the Service Offerings (except to the extent Content included in the Service Offerings are provided to Customer under a separate license that expressly permits the creation of derivative works), (b) reverse engineer, disassemble, or decompile the Service Offerings or apply any other process or procedure to derive the source code of any software included in the Service Offerings, (c) access or use the Service Offerings in a way intended to avoid

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28


legal

Page 5 of 11
AWS260389/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

incurring fees or exceeding usage limits or quotas, or (d) resell or sublicense the Service Offerings. During and after the Term, Customer will not assert, nor will Customer authorize, assist, or encourage any third party to assert, any intellectual property infringement claim regarding any Service Offerings Customer has used. Customer may only use the AWS Marks in accordance with the Trademark Use Guidelines. Customer will not misrepresent or embellish the relationship between AWS and Customer (including by expressing or implying that AWS supports, sponsors, endorses, or contributes to Customer or Customer's business endeavors). Customer will not imply any relationship or affiliation between AWS and Customer except as expressly permitted by this Agreement.

**8.5    Suggestions.** If Customer elects to provide any Suggestions to AWS or its Affiliates, AWS and its Affiliates will be entitled to use the Suggestions without restriction. Customer hereby irrevocably assigns to AWS all right, title, and interest in and to the Suggestions.

**9.    Indemnification.**

**9.1    General.** Customer will defend, indemnify, and hold harmless AWS, its Affiliates and licensors, and each of their respective employees, officers, directors, and representatives from and against any Losses arising out of or relating to any third-party claim concerning: (a) Customer's or any End User's use of the Service Offerings in a manner not authorized by this Agreement; (b) violation of applicable law by Customer, End Users, Customer Content or Customer Submissions; (c) alleged infringement or misappropriation of any third-party rights by Customer Content or Customer Submissions, or by the use, development, design, production, advertising or marketing of Customer Content or Customer Submissions; or (d) a dispute between Customer and any End User.

**9.2    Process.** AWS will promptly notify Customer of any claim subject to Section 9.1, but if AWS fails to promptly notify Customer, this will only affect Customer's obligations under Section 9.1 to the extent that AWS's failure prejudices Customer's ability to defend the claim. Customer may: (a) use counsel of its own choosing (subject to AWS's written consent) to defend against any claim; and (b) settle the claim as Customer deems appropriate, provided that Customer obtains AWS's prior written consent before entering into any settlement.

**10.    AWS Warranties and Warranty Disclaimers.**

**10.2    Warranty Disclaimers.** THE SERVICE OFFERINGS ARE PROVIDED "AS IS." EXCEPT TO THE EXTENT PROHIBITED BY LAW, AWS, ITS AFFILIATES AND ITS LICENSORS MAKE NO OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, REGARDING THE SERVICE OFFERINGS OR THE THIRD-PARTY CONTENT, AND DISCLAIM ALL OTHER WARRANTIES, INCLUDING ANY IMPLIED OR EXPRESS WARRANTIES (A) OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR QUIET ENJOYMENT, (B) ARISING OUT OF ANY COURSE OF DEALING OR USAGE OF TRADE, (C) THAT THE SERVICE OFFERINGS OR THIRD-PARTY CONTENT WILL BE UNINTERRUPTED, ERROR FREE, OR FREE OF HARMFUL COMPONENTS, AND (D) THAT ANY CONTENT, INCLUDING CUSTOMER CONTENT OR THIRD-PARTY CONTENT, WILL BE SECURE OR NOT OTHERWISE LOST OR DAMAGED.

**11.    Limitations of Liability.**

**11.1    Liability Disclaimers.** WILL BE LIABLE TO THE OTHER PARTY UNDER ANY CAUSE OF ACTION OR THEORY OF LIABILITY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, FOR (A) INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, (B) THE VALUE OF LOST DATA, LOSS OF PROFITS, REVENUES, CUSTOMERS, OPPORTUNITIES, OR GOODWILL, OR (C) UNAVAILABILITY OF THE SERVICE OFFERINGS (THIS DOES NOT LIMIT ANY SERVICE CREDITS THAT MAY BE AVAILABLE UNDER THE SERVICE LEVEL AGREEMENTS).

**11.2    Damages Cap.** EXCEPT FOR PAYMENT OBLIGATIONS ARISING UNDER SECTION 9 (INDEMNIFICATION), THE AGGREGATE LIABILITY UNDER THIS AGREEMENT WILL NOT EXCEED THE AMOUNTS PAID BY CUSTOMER TO AWS UNDER THIS AGREEMENT FOR THE SERVICE THAT GAVE RISE TO THE LIABILITY DURING THE 12 MONTHS BEFORE THE LIABILITY

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28


legal

Page 6 of 11
AWS260389/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193



AROSE ██████████████ PROVIDED, HOWEVER THAT NOTHING IN THIS SECTION 11 WILL LIMIT CUSTOMER'S OBLIGATION TO PAY AWS FOR CUSTOMER'S USE OF THE SERVICE OFFERINGS PURSUANT TO SECTION 5, OR ANY OTHER PAYMENT OBLIGATIONS UNDER THIS AGREEMENT

**12. Miscellaneous.**

**12.1   Assignment.** ████████████████████████████████████████████████████████ Subject to the foregoing, this Agreement will be binding upon, and inure to the benefit of the parties and their respective permitted successors and assigns.

**12.2   Counterparts; Facsimile.** This Agreement may be executed by facsimile or by electronic signature in a format approved by AWS, and in counterparts, each of which (including signature pages) will be deemed an original, but all of which together will constitute one and the same instrument.

**12.3   Entire Agreement.** This Agreement incorporates the Policies by reference and is the entire agreement between Customer and AWS regarding the subject matter of this Agreement. This Agreement supersedes all prior or contemporaneous representations, understandings, agreements, or communications between Customer and AWS, whether written or verbal, regarding the subject matter of this Agreement (including, as set forth in Section 1.2, any acceptance of the AWS Customer Agreement by Customer or any of its employees acting on behalf of Customer). AWS will not be bound by any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) including for example, any term, condition or other provision (a) submitted by Customer in any order, receipt, acceptance, confirmation, correspondence or other document, (b) related to any online registration, response to any Request for Bid, Request for Proposal, Request for Information, or other questionnaire, or (c) related to any invoicing process that Customer submits or requires AWS to complete. If the terms of this document are inconsistent with the terms contained in any Policy, the terms contained in this document will control, except that the Service Terms will control over this document. ████████████████████████████████████

**12.4   Force Majeure.** Except for payment obligations, neither party will be liable for any delay or failure to perform any obligation under this Agreement where the delay or failure results from any cause beyond its reasonable control, including acts of God, labor disputes or other industrial disturbances, electrical or power outage, utilities or telecommunications failures, earthquake, storms or other elements of nature, blockages, embargoes, riots, acts or orders of government, acts of terrorism, or war.

**12.5   Governing Law; Venue.** The laws of the State of Washington, without reference to conflict of law rules, govern this Agreement and any dispute of any sort that might arise between the parties. Any dispute relating in any way to the Service Offerings or this Agreement will only be adjudicated in a state or federal court located in King County, Washington. Each party consents to exclusive jurisdiction and venue in these courts. Notwithstanding the foregoing, either party may seek injunctive relief in any state, federal, or national court of competent jurisdiction for any actual or alleged infringement of such party's, its Affiliates' or any third party's intellectual property or other proprietary rights. The United Nations Convention for the International Sale of Goods does not apply to this Agreement.

**12.6   Import and Export Compliance.** In connection with this Agreement, each party will comply with all applicable import, re-import, export, and re-export control laws and regulations, including the Export Administration Regulations, the International Traffic in Arms Regulations, and country-specific economic sanctions programs implemented by the Office of Foreign Assets Control. Customer is solely responsible for compliance with applicable laws related to the manner in which Customer chooses to use the Service Offerings, including (i) Customer's transfer and processing of Customer Content, (ii) the provision of Customer Content to End Users, and (iii) specifying the AWS region in which any of the foregoing occur.

**12.7   Independent Contractors; Non-Exclusive Rights.** AWS and Customer are independent contractors, and this Agreement will not be construed to create a partnership, joint venture, agency, or employment relationship.

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28



legal

Page 7 of 11
AWS260389/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

Neither party, or any of their respective Affiliates, is an agent of the other for any purpose or has the authority to bind the other.

**12.8  Language.**  All communications and Notices made or given pursuant to this Agreement must be in the English language.  If AWS provides a translation of the English language version of this Agreement, the English language version of the Agreement will control if there is any conflict.

**12.9  Nondisclosure; Publicity.**  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Except the extent permitted by applicable law, neither party will issue any press release or make any other public communication with respect to this Agreement or Customer's use of the Service Offerings.  Customer agrees that the contents of this Agreement are not publicly known and will not be disclosed by Customer.

**12.10  Notice.**

(a)  **General.**  Except as otherwise set forth in Section 12 10(b), to give notice to a party under this Agreement, each party must contact the other party as follows: (i) by facsimile transmission; or (ii) by personal delivery, overnight courier or registered or certified mail.  Notices must be sent to the fax number of the other party listed on the Cover Page to this Agreement or addressed to the address of the other party listed on the Cover Page to this Agreement, or such other fax number or address as a party may subsequently designate in a notice to the other party.  Notices provided by personal delivery will be effective immediately.  Notices provided by facsimile transmission or overnight courier will be effective one business day after they are sent.  Notices provided by registered or certified mail will be effective three business days after they are sent.

(b)  **Electronic Notice.**  AWS may provide notice to Customer: (i) under Sections 2.3 or 5.1 by (A) sending a message to the email address then associated with at least one of Customer's AWS Enterprise Accounts, or (B) posting a notice on the AWS Site, (ii) under Section 6.1 by sending a message to the email address then associated with Customer's applicable AWS Enterprise Account, and (iii) under Section 2.1 by sending a message to the email address then associated with at least one of Customer's AWS Enterprise Accounts (or such other email address as agreed upon by the parties) or via a support case.  Any notices provided by posting on the AWS Site will be effective upon posting and notices provided by email will be effective when AWS sends the email.

**12.11  No Third-Party Beneficiaries.**  Except as set forth in Section 9.1, this Agreement does not create any third party beneficiary rights in any individual or entity that is not a party to this Agreement.

**12.12  No Waivers.**  The failure ▓▓▓▓▓▓▓▓ to enforce any provision of this Agreement will not constitute a present or future waiver of such provision nor limit ▓▓▓▓▓▓▓ ight to enforce such provision at a later time.  All waivers by ▓▓▓▓ must be provided in a Notice to be effective.

**12.13  Severability.**  If any portion of this Agreement is held to be invalid or unenforceable, the remaining portions of this Agreement will remain in full force and effect.  Any invalid or unenforceable portions will be interpreted to give effect to the intent of the original portion.  If such construction is not possible, the invalid or unenforceable portion will be severed from this Agreement but the rest of the Agreement will remain in full force and effect.

**13.  Definitions.**  Defined terms used in this Agreement with initial letters capitalized have the meanings given below:

"**Acceptable Use Policy**" means the policy currently available at http://aws.amazon.com/aup (and any successor or related locations designated by AWS), as it may be updated by AWS from time to time.

"**Account Information**" means information about Customer that Customer provides to AWS in connection with the creation or administration of an AWS Enterprise Account. For example, Account Information includes names, usernames, phone numbers, email addresses and billing information associated with an AWS Enterprise Account.

"**Affiliate**" means any entity that directly or indirectly controls, is controlled by or is under common control with that party.

"**API**" means an application program interface.

"**AWS Content**" means Content that AWS or any of its Affiliates makes available in connection with the Services or on the AWS Site to allow access to and use of the Services, including APIs, WSDLs, sample code; software libraries;

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28


legal

Page 8 of 11
AWS260389/2933075
2017 01 23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

command line tools; proofs of concept, templates, and other related technology (including but not limited to any of the foregoing that are provided by any AWS personnel). AWS Content does not include the Services or Third-Party Content.

"**AWS Customer Agreement**" means AWS's standard user agreement posted on the AWS Site at http://aws.amazon.com/agreement (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

"**AWS Enterprise Account**" means an AWS account opened by Customer using a Customer-issued email address (with an email domain name that is owned by Customer) that includes Customer's full legal name in the "Company Name" field associated with the AWS account.

"**AWS Marks**" means any trademarks, service marks, service or trade names, logos, and other designations of AWS and its Affiliates that AWS may make available to Customer in connection with this Agreement.

"**AWS Network**" means AWS's data center facilities, servers, networking equipment, and host software systems (e.g., virtual firewalls) that are within AWS's control and are used to provide the Services.

██████████████████████████████████████████████████

"**AWS Site**" means http://aws.amazon.com (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

"**Content**" means software (including machine images), data, text, audio, video, or images.

"**Customer Content**" means Content that Customer or any End User transfers to AWS for processing, storage or hosting by the Services in connection with an AWS Enterprise Account and any computational results that Customer or any End User derive from the foregoing through its use of the Services. For example, Customer Content includes Content that Customer or any End User stores in Amazon Simple Storage Service. Customer Content does not include Account Information.

"**Customer Submissions**" means Content that Customer posts or otherwise submits to developer forums, sample code repositories, public data repositories, community-focused areas of the AWS Site, or any other part of the AWS site that allows third parties to make available software, products, or data.

"**Disputed Amounts**" means amounts disputed by Customer in a Notice and in good faith as billing errors.

"**Documentation**" means the user guides and admin guides (in each case exclusive of content referenced via hyperlink) for the Services located at http://aws.amazon.com/documentation (and any successor or related locations designated by AWS), as such user guides and admin guides may be updated by AWS from time to time.

"**End User**" means any individual or entity that directly or indirectly through another user: (a) accesses or uses Customer Content; or (b) otherwise accesses or uses the Service Offerings under an AWS Enterprise Account. The term "End User" does not include individuals or entities when they are accessing or using the Services or any Content under their own account, rather than an AWS Enterprise Account.

"**Indirect Taxes**" means applicable taxes and duties, including, without limitation, VAT, GST, excise taxes, sales and transactions taxes, and gross tax receipts.

"**Losses**" means any claims, damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees).

██████████████████████████████████████████████████

"**Notice**" means any notice provided in accordance with Section 12.10.

"**Policies**" means the Acceptable Use Policy, Privacy Policy, the Terms of Use, the Service Terms, the Trademark Use Guidelines, all restrictions described in the AWS Content and on the AWS Site, and any other policy or terms referenced in or incorporated into this Agreement, but does not include whitepapers or other marketing materials referenced on the AWS Site.

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28



Page 9 of 11
AWS2603B9/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

"**Privacy Policy**" means the privacy policy currently referenced at http://aws.amazon.com/privacy (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

"**Service**" means each of the services made available by AWS or its Affiliates for which Customer registers via the AWS Site, including those web services described in the Service Terms. Services do not include Third-Party Content.

"**Service Attributes**" means Service usage data related to an AWS Enterprise Account, such as resource identifiers, metadata tags, security and access roles, rules, usage policies, permissions, usage statistics and analytics.

"**Service Level Agreement**" means all service level agreements that AWS offers with respect to the Services and post on the AWS Site, as they may be updated by AWS from time to time. The service level agreements that AWS currently offers with respect to the Services are located at https://aws.amazon.com/legal/service-level-agreements (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

"**Service Offerings**" means the Services, the AWS Content, the AWS Marks, and any other product or service provided by AWS under this Agreement. Service Offerings do not include Third-Party Content.

"**Service Terms**" means the rights and restrictions for particular Services located at http://aws.amazon.com/serviceterms (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

"**Suggestions**" means all suggested improvements to the Service Offerings that Customer provides to AWS.

"**Term**" means the term of this Agreement described in Section 7.1.

"**Termination Date**" means the effective date of termination provided in accordance with Section 7, in a Notice from one party to the other.

"**Terms of Use**" means the terms of use located at http://aws.amazon.com/terms/ (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

"**Third-Party Content**" means Content of a third party made available on the AWS Marketplace or on developer forums, sample code repositories, public data repositories, community-focused areas of the AWS Site, or any other part of the AWS site that allows third parties to make available software, products, or data.

"**Trademark Use Guidelines**" means the guidelines and trademark license located at http://aws.amazon.com/trademark-guidelines/ (and any successor or related locations designated by AWS), as may be updated by AWS from time to time.

AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28


legal

Page 10 of 11
AWS260389/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193



AWS Enterprise Agreement
AMAZON CONFIDENTIAL
AMZN DOC# 416371_28



Page 11 of 11
AWS260389/2933075
2017-01-23

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

AMENDMENT NO. 1 TO AWS ENTERPRISE AGREEMENT

This Amendment No. 1 (this "**Amendment**") to the AWS Enterprise Agreement (the "**Agreement**") dated February 28, 2017 by and between Amazon Web Services, Inc. ("**AWS**") and the State of Arizona, on behalf of its departments, agencies, commissions, and boards ("**Customer**") is effective as of February 28, 2017 (the "**Amendment Effective Date**"). Unless otherwise defined in this Amendment, all capitalized terms used in this Amendment will have the meanings ascribed to them in the Agreement. The parties agree as follows:

1. **Termination for Convenience; Appropriations.** Section 7.2(a) ("Termination for Convenience") is deleted and is replaced with the following:



2. **Indemnification.** Section 9.1 of the Agreement ("Indemnification; General") is deleted and is replaced with the following:



3. **Governing Law; Venue.** Section 12.5 of the Agreement ("Governing Law; Venue") is deleted and is replaced with the following:



4. **Arizona State Provisions.** Section 12.14 ("Arizona State Provisions") is added to the Agreement following Section 12.13:



DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193



5.  **Nondisclosure.** Customer agrees that the existence and details of this Amendment are not publicly known and constitute AWS Confidential Information ▮▮▮▮▮▮▮▮▮▮ Accordingly. Customer will not disclose this Amendment—in whole or in part-▮

6.  **Entire Agreement; Conflict.** Except as amended by this Amendment, the Agreement will remain in full force and effect. This Amendment, together with the Agreement as amended by this Amendment: (a) is intended by the parties as a final, complete and exclusive expression of the terms of their agreement, and (b) supersedes all prior agreements and understandings between the parties with respect to the subject matter hereof. If there is a conflict between the Agreement, this Amendment or any other amendment or addendum to the Agreement or this Amendment, the document later in time will prevail.

7.  **Counterparts and Facsimile Delivery.** This Amendment may be executed in two or more counterparts, each of which shall be deemed an original and all of which taken together shall be deemed to constitute one and the same document. The parties may sign and deliver this Amendment by facsimile transmission.

*[Remainder of Page Intentionally Left Blank.]*



DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

IN WITNESS WHEREOF, Customer and AWS have executed this Amendment as of the Amendment Effective Date.

AMAZON WEB SERVICES, INC.

By: _Shannon Lowther_

Name: Shannon Lowther

Title: Authorized Representative

Date: March 14, 2017

THE STATE OF ARIZONA

By: _Righetti_

Name: Charlotte Righetti

Title: State Procurement Manager

Date: 3.10.17

Amendment No. 1 to AWS EA
AMAZON CONFIDENTIAL

legal

Page 3 of 5
AWS260389/3012571
2017-02-28

DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

Attachment B
Arizona State Provisions

Capitalized terms not otherwise defined in this document have the meanings assigned to them in the applicable
AWS Enterprise Customer Agreement.

1.  **Nondiscrimination**. The parties will comply with all applicable state and federal laws, rules, regulations, and
    executive orders governing equal employment opportunity, immigration, and nondiscrimination, including
    the Americans with Disabilities Act. If applicable, the parties will abide by the requirements of 41 CFR §§ 60-
    1.4(a), 60-300.5(a) and 60-741.5(a). If applicable, these regulations prohibit discrimination against qualified
    individuals based on their status as protected veterans or individuals with disabilities, and prohibit
    discrimination against all individuals based on their race, color, religion, sex, or national origin. Moreover,
    where applicable, these regulations require that covered prime contractors and subcontractors take
    affirmative action to employ and advance in employment individuals without regard to race, color, religion,
    sex, national origin, protected veteran status, or disability.

2.  **Conflict of Interest**. If within three (3) years after the execution of this Agreement, AWS hires as an
    employee or agent any Customer representative who was significantly involved in negotiating, securing,
    drafting, or creating this Agreement, then Customer may—in accordance with its termination rights under
    7.2(a) and 7.3 of this Agreement—cancel this Agreement as provided in A.R.S. § 38-511 (Section 38-511 of
    the Arizona Revised Statutes).

3.  **Arbitration in Superior Court**. As required by A.R.S. § 12-1518 (Section 12-1518 of the Arizona Revised
    Statutes), the parties agree to make use of arbitration in disputes that are subject to mandatory arbitration
    pursuant to A.R.S. § 12-133.

4.  **Records**. To the extent required by Sections 35-214 and 35-215 of the Arizona Revised Statutes, the parties
    will retain all records relating to this Agreement. AWS will make its records available at all reasonable times
    for inspection and audit by Customer or the Auditor General of the State of Arizona during the term of this
    Agreement and for a period of five (5) years after the completion of this Agreement.

5.  **E-Verify Requirements**. As required by A.R.S. § 41-4401 (Section 41-4401 of the Arizona Revised Statutes),
    Customer is prohibited from awarding a contract to any contractor or subcontractor that fails to comply
    with A.R.S. § 23-214(A) (verification of employee eligibility through the e-verify program). AWS warrants
    that it and its subcontractors comply with applicable federal immigration laws and regulations that relate to
    the immigration status of their employees and their compliance with A.R.S. § 23-214(A). Customer retains
    the legal right to inspect the papers of any contractor or subcontractor employee who works directly on the
    Agreement to ensure that the contractor or subcontractor is complying with the above warranty. Should
    Customer determine that AWS is not compliant, Customer may pursue all remedies permitted by law and
    this Agreement.

6.  **Section 508 Compliance**. Under A.R.S. § 18-132 (Section 18-132 of the Arizona Revised Statutes), Customer
    has an obligation to ensure that information technology is accessible to individuals with disabilities in
    accordance with the accessibility standards adopted under section 508 of the rehabilitation act of 1973 (29
    United States Code section 794d) unless doing so would impose an undue burden on Customer.



DocuSign Envelope ID: 2ECEF7D0-BBE5-430F-B284-6DAECC0A6193

7.   **Insurance.** To the extent set forth in this Paragraph 7, AWS will purchase and maintain insurance against claims for injury to persons or damage to property that may arise from or in connection with the performance of this Agreement by AWS, its agents, representatives, or employees. Each insurance policy required by this Agreement must be in effect at or prior to commencement of work under this Agreement and remain in effect for the duration of the Agreement.

   a.   **Coverage Limits.** AWS will maintain coverage with limits of liability not less than those stated below:

      i.   **Commercial General Liability – Occurrence Form.** Policy shall include bodily injury, property damage, personal injury and broad form contractual liability coverage. Policy's blanket endorsements shall include Customer as additional insureds and contain a waiver of subrogation endorsement, as required by this written agreement, in favor of the State of Arizona, its departments, agencies, boards, commissions, universities and its officers, officials, agents, and employees for losses arising from work performed by or on behalf of AWS.

| | |
|---|---|
| • General Aggregate | $5,000,000 |
| • Products – Completed Operations Aggregate | $1,000,000 |
| • Personal and Advertising Injury | $1,000,000 |
| • Each Occurrence | $1,000,000 |

      ii.  **Worker's Compensation and Employers' Liability.** Policy shall contain a waiver of subrogation endorsement, as required by this written agreement, in favor of the State of Arizona, its departments, agencies, boards, commissions, universities and its officers, officials, agents, and employees for losses arising from work performed by or on behalf of AWS. This sub-paragraph 7(a)(ii) will not apply to AWS or any subcontractor exempt under A.R.S. 23-901.

| | |
|---|---|
| • Workers' Compensation | Statutory |
| • Employers' Liability | |
|    - Each Accident | $1,000,000 |
|    - Disease – Each Employee | $1,000,000 |
|    - Disease – Policy Limit | $1,000,000 |

   b.   **Acceptability of Insurers.** Insurance shall be placed with duly licensed or approved non-admitted insurers in the State of Arizona with an "A.M. Best" rating or not less than A- VII. Customer in no way warrants that the above required minimum insurer rating is sufficient to protect AWS from potential insurer insolvency.

   c.   **Verification of Coverage.** AWS will make available a memorandum of insurance ("MOI") evidencing that AWS has the insurance required by this Agreement: www.amazon.com/moi (or its successor location). All evidence of insurance required by this Agreement will be made available via the above MOI link.

   d.   **Approval.** These insurance requirements are standard insurance requirements. Any modification or variation from these insurance requirements will require the approval of the Arizona Department of Administration Risk Management Section.

8.   **Boycott of Israel.** AWS is not knowingly engaged in a boycott of Israel as defined in A.R.S. § 35-393.01 (Section 35-393.01 of the Arizona Revised Statutes)



# EXHIBIT 2

# ARIZONA REVISED STATUTES

41-2536. Sole source procurement

A contract may be awarded for a material, service or construction item without competition if the director determines in writing that there is only one source for the required material, service or construction item. The director may require the submission of cost or pricing data in connection with an award under this section. Sole source procurement shall be avoided, except when no reasonable alternative sources exist. A written determination of the basis for the sole source procurement shall be included in the contract file.

# EXHIBIT 3

**CHAIRMAN DON SHOOTER**
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-4139
TOLL FREE   1-800-352-8404
dshooter@azleg.gov

DISTRICT 13

COMMITTEES:
APPROPRIATIONS, CHAIRMAN
EDUCATION
——
JOINT LEGISLATIVE BUDGET
COMMITTEE - CHAIRMAN
JOINT COMMITTEE ON CAPITAL REVIEW
INFORMATION TECHNOLOGY
AUTHORIZATION COMMITTEE

Arizona House of Representatives
Phoenix, Arizona 85007

August 1, 2017

Mr. Craig C. Brown, Director
Office of the Director
Arizona Department of Administration
100 N. 15th Avenue
Phoenix, Arizona 85007

Re: "Competition Not Practicable" Finding for General Cloud Services

Dear Director Brown:

Thank you for meeting with me. I still have the same questions.

Why has our state not put out for bid a request for general cloud services? It is my understanding that once the state completes a competitive bid process, the state may then select and maintain a list of numerous, authorized, general cloud service providers that state agencies may choose from. Yet, it is my understanding that state agencies looking to procure cloud services are directed by Morgan Reed and the State Procurement Office, to the **only** state contract for general cloud services that **which was not competitively bid.** How can this be?

Discouraging competition in technology contracts by ADOA has been issue that I have been trying to solve for years. My concerns relating to issues of fairness at ADOA continue to arise. In April, I learned that the State of Arizona entered into a "Sole Source" contract to obtain "general cloud services". It is not clear to me how the use of a sole source contract for general cloud services is appropriate.

According to the Arizona procurement code:

> [T]he term "sole source procurement" means a material or service procured without competition when:
>
> 1. There is only a single source for the material or service, or
> 2. No reasonable alternative source exists.

Now, my background is not in law nor technology, but I do know a little something about the basic principles of fairness and am *very* familiar with the interests of taxpayers. Please explain to me how a sole source contract for general cloud services, which I am certain that more than only one company offers or would like the opportunity to offer at a competitive price, makes any sense. Just walking through the Phoenix airport you'll find advertisements for a dozen cloud

service providers. By my estimation, the state of Arizona taxpayers, agencies and vendors are being hornswaggled and after giving you a chance for months to come up with a fair approach to this problem, I have lost my faith that representatives of ADOA will be making better decisions anytime soon.

The 'competition impracticable' determination is improper, incorrect and potentially damaging to Governor Ducey as it is obviously favoritism. I am certain that this is the total antithesis of what Governor Ducey's free market principals demand. I am very concerned that every day this issue goes unresolved puts Governor Ducey in unnecessary jeopardy. Why would you do that?

State IT representatives have promoted, publically, their reliance on their sole source contract for cloud needs. In fact, I understand that our State CIO, when speaking at a technology forum, pronounced the state's intention to remain the state that buys/spends the most on cloud services of any state in the country from the provider who was given the sole source contract, and in fact, hopes to increase our state's current spending with that particular vendor.

You have promised to solve this problem for three months. Stakeholder meetings were promised but none have been called. Therefore, I will host my own stakeholder meetings, with as many cloud vendors as want to attend and provide me their opinions and potential resolutions to this nonsense. Then I will hold public committee hearings where I am certain shining some light on the issue will help disinfect unfair practices.

Signed,

Don Shooter

cc:     Kevin Donnellan

         Nicole Ong

         Gretchen Martinez

# EXHIBIT 4



Arizona Department of
Public Safety

# Case Report

## Details

| Involved Incident #(s) | Date/Time | Location |
|---|---|---|
| AZ1700005732 | 04/19/2017 10:45 | 1700 W Washington St, Phoenix, Arizona 85007 |

**Arizona vs.**

| | |
|---|---|
| *Case Agent:* | #7108 GLUECK, T. |
| *Case File #:* | C17001713 |
| *Case Class:* | Incident |

## Synopsis

*No report text found*



Arizona Department of
**Public Safety**

## Victim/Witness List

*Victims*
Donald Shooter                 *Office/employment*: 1700 W Washington St, Phoenix, Arizona 85007

**DPS Employees / Investigators**

| | | |
|---|---|---|
| Tristan Glueck, #7108 | Case agent | TGlueck@azdps.gov |
| Tonya Noah, #6329 | Case supervisor | TNoah@azdps.gov |
| Stuart Mcguffin, #6922 | Assisting detective | SMcGuffin@azdps.gov |
| William Rainey Jr, #6849 | Assisting detective | BRainey@azdps.gov |



Arizona Department of
## Public Safety

# General Report

| Incident Number: **AZ1700005732** |
| --- |
| Author: #7108 GLUECK, T. |

**Notification**

On Wednesday April 19, 2017, the Arizona Department of Public Safety (DPS), Threat Mitigation Unit (TMU), Detective Tristan Glueck, #7108, was informed by DPS TMU Sergeant Tonya Noah, #6329, of a request from the legislative liaison detail at the Arizona State Capitol to evaluate a possible threat. The threat was reported by Arizona Representative Donald Shooter's assistant.

**Investigative Actions**

The initial information provided to Detective Glueck conveyed that a silver Honda CRV, bearing Arizona license plate #AAK6071, had followed Mr. Shooter from a softball game. Mr. Shooter attempted to lose the driver who was following him. Mr. Shooter then conveyed when he confronted the vehicle the driver ran him off the road and sped off. Mr. Shooter said he identified the license plate, and believed he knew who the driver was and had a restraining order against him. Mr. Shooter further stated he believed the driver was a former FBI agent, and felt threatened by him.

Further checks revealed Arizona license plate #AAK6071 is registered to Daniel Ryan D.O.B.
. Mr. Ryan did not have a restraining order on his record. Mr. Ryan was a licensed Private Investigator in Arizona for the firm "Specialized Investigations".

Sergeant Noah and Detective Glueck contacted Mr. Shooter via telephone and Mr. Shooter said he would prefer to meet in person. At approximately 1237 hours, Sergeant Noah and Detective Glueck met with Mr. Shooter in his office. Mr. Shooter said on the night of April 18, 2017, he attended a Legislature/Lobbyist softball game in Tempe. Following the game, he noticed a silver sport utility vehicle, but did not think too much of it.

After leaving the game he drove to the Buttes, also located in Tempe, for drinks with a friend arriving at 10:00 p.m. Mr. Shooter stated he left the Buttes at approximately 10:30 p.m. and he noticed the silver SUV following him. He stated he attempted to lose the SUV by driving down rarely used streets and into the Biltmore Mall, but ultimately ended up at his house. Mr. Shooter stated he pulled into his driveway, exited his vehicle and saw the SUV still near him. Mr. Shooter said he got back into his vehicle to confront the subject in the SUV. Mr. Shooter said he drove toward the SUV, which drove away in a manner that almost ran him off the road, "like it



Arizona Department of
**Public Safety**

Incident Number: **AZ1700005732**

Author: #7108 GLUECK, T.

## General Report Continued

was playing chicken". Detective Glueck asked Mr. Shooter what type of vehicle he drove, and he said a black Mercedes Sedan.

Mr. Shooter said he followed the SUV and confirmed it was the same vehicle as earlier via the license plate. Mr. Shooter said the vehicle did not have any other indicia or unique characteristics to identify it.

Mr. Shooter asked Detective Glueck and Sergeant Noah for the information obtained from the license plate he provided. Sergeant Noah explained to Mr. Shooter the information is not for public dissemination, and by providing it to Mr. Shooter it would be a breach of ethics and law. Mr. Shooter said he understood and did not want Sergeant Noah or Detective Glueck to do anything illegal.

Detective Glueck asked Mr. Shooter to identify the subject he believed was after him, and had a restraining order against. Mr. Shooter said he could not remember the exact name, but it was a Private Investigator, with an FBI background, and he believed the name was Doug Hopkins, or Hoskins. Mr. Shooter told Detective Glueck the restraining order was two or three years old. When Mr. Shooter was told the individual with the license plate was not that subject; and had no restraining orders, Mr. Shooter suggested it might be the same man but with another name. Mr. Shooter said the investigator he had a restraining order on was an older white male.

Detective Glueck located the licensed Private Investigator named Douglas Hopkins who was an older white male, and worked for a Firm called Gbi Associates. On their webpage one of the boasting points is they employ former FBI agents. Detective Glueck compared photographs of Mr. Ryan, and Douglas Hopkins. Based on the photographs they do not bear a physical resemblance.

At approximately 1554 hours, Sergeant Noah, Detective Glueck, Detective Bill Rainey, #6849, and Border Patrol Agent J   Rodriguez, #80320, went to Mr. Ryan's residence of record at                  in            Arizona to speak with him regarding the events. No contact was made at the residence. Detective Glueck contacted three telephone numbers listed as possibly belonging to Mr. Ryan.

- The first phone number, (                 was for Specialized Investigations (Mr. Ryan's firm).
- The second phone number, (                      returned to a female voicemail (Mr. Ryan is listed as having a wife).
- The third phone number, (                 : and was answered by a male subject identifying himself at Ted Matz.



Arizona Department of
**Public Safety**

Incident Number: **AZ1700005732**

Author: #7108 GLUECK, T.

## General Report Continued

Mr. Matz informed Detective Glueck he was a friend of Mr. Ryan. Mr. Matz told Detective Glueck the best number to reach Mr. Ryan was (          .          . Detective Glueck left a voicemail on (          , and (          , with a request for Ryan to call him.

On April 20, 2017, at approximately 0814 hours, Detective Glueck received a telephone call from Mr. Ryan. Detective Glueck explained Mr. Ryan's vehicle had been reported in an area where erratic driving had been reported and Detective Glueck wanted to speak with him in person regarding anything he may have witnessed, or participated in. Mr. Ryan Told Detective Glueck to speak with his attorney Ted Matz, and provided the phone number. It should be noted this was the same number Detective Glueck spoke with Mr. Matz on the previous day.

When contacted again, Mr. Matz asked Detective Glueck what he wanted to speak with Mr. Ryan about. Detective Glueck explained Ryan's vehicle had been reported in an area where erratic driving had been reported and Detective Glueck wanted to speak with Mr. Ryan regarding it. Mr. Matz advised Mr. Ryan had been hired by a client, and on the night in question he was conducting surveillance. Mr. Matz said Mr. Ryan called 911 to report the vehicle he was following was possibly being operated by a drunk driver.

Sergeant Noah and Detective Glueck contacted DPS Operational Communications (Opcomm) and requested a search of any Attempt to Locate (ATL) calls from the approximately time frame provided by Mr. Shooter. Opcomm received a call at 2208 hours from a party who refused to identify himself. The party described a possible drunk driver on State Route 143, in a black Mercedes bearing Arizona License plate #AZD6090. The license plate returns to Susan Mr. Shooter, and the vehicle matches the description given by Mr. Shooter of the vehicle he was driving on April 18th.

Detective Glueck contacted the Phoenix Police Department to see if there were any additional 911 calls related to the vehicles in question. A call including a description of the Mercedes, as found in the Phoenix Police dispatch logs. The call conveyed a possible drunk driver in a black Mercedes being followed by a Honda SUV (described by the caller). The call indicates the reporting party lost visual contact with the Mercedes at the Biltmore.

On April 21, 2017, at approximately 0810 hours, Detective Glueck spoke with Maricopa County Prosecuting Attorney Rebecca Jones, regarding the elements of this case. After hearing the elements of the case Ms. Jones advised she did not see a criminal nexus through which to proceed. The lack of identification of the subject driving the SUV, the lack of witnesses, and the fact this is a single occurrence with an unknown party following Mr. Shooter all factor into this decision.

 Arizona Department of
Public Safety

Incident Number: **AZ1700005732**

Author: #7108 GLUECK, T.

## General Report Continued

**Conclusion**

After investigating the facts and details surrounding this case it was determined no criminal acts were definitively committed.   The information suggests that Mr. Ryan was conducting surveillance for a client near the softball game being attended by members of the political community.  Whether the surveillance originally was on Mr. Shooter is unknown, as Mr. Matz did not identify the subject of Mr. Ryan's investigation.

Mr. Ryan observed Mr. Shooter driving in a manner that caused him to call 911, and Mr. Shooter mentioned trying to evade the vehicle following him, at one point by driving into the Biltmore mall.  This coincides with the actions reported to PPD 911 by Mr. Ryan.

At the time of this report, no further investigation is being pursued.

 Arizona Department of
## Public Safety

## Supplemental Report

Incident Number: **AZ1700005732**

Author: #6922 MCGUFFIN, S.

**Notification**

On Wednesday, April 19, 2017, the Arizona Department of Public Safety (DPS), Threat Mitigation Unit (TMU) Detective Stuart McGuffin, #6922, was informed by DPS TMU Detective Tristian Glueck, #7108, of a threatening encounter to Arizona Representative Shooter.

According to Glueck, it was alleged, a subject attempted to run Shooter's vehicle off the road on the evening of April 18, 2018.

Glueck stated DPS TMU Sergeant Tonya Noah, #6329, assigned him the lead investigator and asked McGuffin assist with the investigation.

**Investigative Actions**

At approximately 1030 hours, McGuffin conducted a registration check on Arizona registration, #AAK6071. The check revealed the vehicle was registered to a Daniel Ryan in Scottsdale, Arizona. McGuffin conducted a driver's license check on Ryan. The check revealed Ryan had a valid driver's license. McGuffin forwarded both the registration and driver's license returns to Glueck and a digital copy of Ryan's driver's license photograph.

McGuffin searched Ryan's listed address,                               Arizona. McGuffin retrieved a map and image of Ryan's residence from Google and forwarded the information to Glueck for review.

At approximately 1100 hours, Noah requested McGuffin forward his findings for her review. McGuffin emailed the aforementioned information to Noah.

This concluded McGuffin's involvement in the investigation.



Arizona Department of
## Public Safety

## Supplemental Report

Incident Number: **AZ1700005732**

Author: #6849 RAINEY J   W.

On April 20, 2017, at approximately 1200 hours, Department of Public Safety (DPS) Detective
William Rainey, #6849, was assigned to assist DPS Detective Tristan Glueck, #7108, with a
possible reckless driving and endangerment case. The case involved Arizona House of
Representative Don Shooter and a subject named Daniel Ryan.

At approximately 1300 hours, Detective Rainey authored a "Knock and Talk" operations plan for
Ryan's residence located at,                          ,                   Arizona.

At approximately 1555 hours, Detective Rainey arrived at
Arizona, and approached the front door on foot with Detective Glueck. Detective Glueck and
Detective Rainey rang the doorbell and knocked on the front door several times, with no
response. No movement was heard from within the residence and no vehicles were seen parked
outside of the residence. DPS Sergeant Tonya Noah, #6329, and United States Border Patrol
Agent JR Rodriguez, #80320, provided support as a cover team.

At approximately 1605 hours, Detective Rainey, Detective Glueck, Sergeant Noah, and Agent
Rodriguez established stationary surveillance in the area, in anticipation of Ryan's return.

At approximately 1750 hours, Detective Rainey departed the area as surveillance was terminated
due to lack of activity.

This concluded Detective Rainey's involvement in the case.

```
04/20/17  12:58:27 PRINT REQUESTED BY TERMINAL PAD4

 Incident History for: #P1704182136

 Received      04/18/17  22:08:39  BY PD08  /PS6588
 Entered       04/18/17  22:10:17  BY PD08  /PS6588
 Closed        04/18/17  22:10:17

 Initial Type: ATL        Final Type: ATL    (ATL - MISC)
 Initial Priority: 3      Final Priority: 3
 Disposition: TOT     Source: 9   Primary Unit:
 Patrol BLK:   Fire BLK:   Other BLK:
 Group: ME      Beat:     TB Map Page:
 Loc: NB SR143 AT MCDOWELL   (NV)
 Loc Info: VERIZON WRLS 800 451 5242
 Name: REFUSED              Addr: 5321 E WASHINGTON ST W  Phone:

 Cell lat/long: +033.44658/-111.98134  E911 line: P08

/2210  (PS6588  )   ADVISD         PD08/ BLK MERZ AZD6090 AZ/ C702/ TOT PHX PD
/2210              GDISPO         D/TOT
```

# PHOENIX POLICE DEPARTMENT
## Calls for Service Data Sheet
### 201700672145

Page 1 of 7
04/21/2017 12:27

| | | | |
|---|---|---|---|
| CFS Number 201700672145 | ORI CFS Number 672145 | Dispatcher Name A4537 | Dispatcher ID E39 |
| Priority 1: PRIORITY 1 | Agency PHX | Status | Route Time |
| Title/Event 390D | | Occurred 04/18/2017 22:10 | First Dispatched 04/18/2017 22:11 | ☐ Domestic Violence |
| Call Code 1 390D: DRUNK DRIVER | Call Code 2 390D: DRUNK DRIVER | Received 04/18/2017 22:10 | Enroute Time 04/18/2017 22:11 | First Arrived 04/18/2017 22:13 |
| Call Code 3 | Call Code 4 | Entered 04/18/2017 22:10 | Transport Enroute | Transport Arrived |
| Situation Found | Type | Cleared 04/18/2017 22:13 | Completed | Enough Units Time |
| Action | Alarm | Hold Time | | |
| Call Source 9: 911 SYSTEM | Premise | Primary Offficer | | |
| Division | Supervisor A5842 | Primary Officer Division | Primary Officer Squad |
| Disposition N: NO ACTION REQUIRED | | Primary Officer District | |
| Call Taker A5842 | Dispatched 1 | ESN | EMS Box |

## Event Location
## Accident

| Accident Report Number | Link Date |
|---|---|

## Caller

| Last/Full Name VERIZON WRLS 80 | First Name ANON | Phone | DOB |
|---|---|---|---|

Notes
CMP FOLLOWING BLK MERCEDES 4DR PC @AZD6090

## Field Interview

| Field Contact Number | Link Date |
|---|---|

## Incident

| Incident Number | Offense Code | Link Date |
|---|---|---|

## Miscellaneous Service

| Miscellaneous Service Number | Link Date |
|---|---|

## Officer

| Unit1 | Officer 1 | Officer 2 |
|---|---|---|
| Unit2 | Officer 1 | Officer 2 |
| Unit3 | Officer 1 | Officer 2 |
| Unit4 | Officer 1 | Officer 2 |

Approved By          Approved On

## Record

| Created On 04/18/2017 22:13 | Created By VERSATERMTORMS | Record Number 105707708 |
|---|---|---|
| Updated On 04/18/2017 22:29 | Updated By VERSATERMTORMS | Agency ID PHX |

PHOENIX POLICE DEPARTMENT
Calls for Service Data Sheet
201700672145

## Remarks

INITIAL REMARKS: CMP FOLLOWING BLK MERCEDES 4DR PC @AZD6090 ADDITIONAL REMARKS: CMP IN WHI HOND SUVJ*SUVNOW NB 44SCORRECTION NB 40S73J MONTPASSING OAK STBCHMCOMING UP ON THOMAS //RED LIGHTIN THE LEFT LNGRN LIGHT //STILL NB 40SPASSING OSBORNCOMING UP ON ISRRED LIGHT FOR ISR AT THE MOMENTON 40STHROUGH THE LIGHT AT ISR //STILL NB 40SCONTINUING THROUGH CAMPBELLIN TURN LN TO GO WB CBAKC*CBACKNOW WB CBACK FROM 40SVEH NOW SPEEDING A BITPASSING 36S //STILL WBPASSED 32SCOMING UP ON 24SNB 24S722K SPEEDSCMP SAID SUBJ WAS TAKING BACK WAY THEN LINE DISCONNECTEDCALLING BACKCOMP HAVE FLASHERS ONHAVE CMP BACK ON 21 //SAYS VEH TURNED INTO BILTMOREHOTEL OR MALLCMP NO LONGER HAS VISUAL ON VEH AFTER IT TURNED INTO BILTMORE FASHSION SQUARE //DOESNT WANT CONTACTEOCCLR ITCLR AND CV ON ADECKBC ON 6/7

## Units

| Unit | Unit Trip ID | | |
|---|---|---|---|
| 724M | | | |

| Officer 1 | | Officer 2 | |
|---|---|---|---|
| 08409: SEAN   NOLLETTE | | 09034: SETH   ZACHARIAS | |

| Officer 3 | | Officer 4 | |
|---|---|---|---|
| Status | Disposition | Date/Time Stamp | Group ID |
| N/A | | 4/18/2017 22:27 | |
| Car ID | Location | | |
| Agency | Agency ID | | |
| | PHX | | |

| | Created On | Created By | Updated On | Updated By |
|---|---|---|---|---|
| Comments | 4/18/2017 22:29 | VERSATERMTORMS | 4/18/2017 22:29 | VERSATERMTORMS |

| Unit | Unit Trip ID | | |
|---|---|---|---|
| 722K | | | |

| Officer 1 | | Officer 2 | |
|---|---|---|---|
| 08865: NICHOLAS   MILLER | | | |

| Officer 3 | | Officer 4 | |
|---|---|---|---|
| Status | Disposition | Date/Time Stamp | Group ID |
| N/A | | 4/18/2017 22:27 | |
| Car ID | Location | | |
| Agency | Agency ID | | |
| | PHX | | |

| | Created On | Created By | Updated On | Updated By |
|---|---|---|---|---|
| Comments | 4/18/2017 22:29 | VERSATERMTORMS | 4/18/2017 22:29 | VERSATERMTORMS |

| Unit | Unit Trip ID | | |
|---|---|---|---|
| 711J | | | |

| Officer 1 | | Officer 2 | |
|---|---|---|---|
| 06956: CHAD   METCALF | | | |

| Officer 3 | | Officer 4 | |
|---|---|---|---|
| Status | Disposition | Date/Time Stamp | Group ID |
| N/A | | 4/18/2017 22:27 | |
| Car ID | Location | | |
| Agency | Agency ID | | |
| | PHX | | |

| | Created On | Created By | Updated On | Updated By |
|---|---|---|---|---|
| Comments | 4/18/2017 22:29 | VERSATERMTORMS | 4/18/2017 22:29 | VERSATERMTORMS |

PHOENIX POLICE DEPARTMENT
Calls for Service Data Sheet
201700672145

| Unit 714T | | Unit Trip ID | | |
|---|---|---|---|---|
| Officer 1 10036: DAVID   HADLOCK | | | Officer 2 09406: RODNEY   LOMIBAO | |
| Officer 3 | | | Officer 4 | |
| Status N/A | | Disposition | Date/Time Stamp 4/18/2017 22:27 | Group ID |
| Car ID | | Location | | |
| Agency | | Agency ID PHX | | |
| | Created On 4/18/2017 22:29 | Created By VERSATERMTORMS | Updated On 4/18/2017 22:29 | Updated By VERSATERMTORMS |
| Comments | | | | |

| Unit 71J | | Unit Trip ID | | |
|---|---|---|---|---|
| Officer 1 05881: MATTHEW   VERTHEIN | | | Officer 2 | |
| Officer 3 | | | Officer 4 | |
| Status N/A | | Disposition | Date/Time Stamp 4/18/2017 22:27 | Group ID |
| Car ID | | Location | | |
| Agency | | Agency ID PHX | | |
| | Created On 4/18/2017 22:29 | Created By VERSATERMTORMS | Updated On 4/18/2017 22:29 | Updated By VERSATERMTORMS |
| Comments | | | | |

| Unit 714M | | Unit Trip ID | | |
|---|---|---|---|---|
| Officer 1 07977: ERIC   GOMEZ | | | Officer 2 07242: BRIAN   WALKER | |
| Officer 3 | | | Officer 4 | |
| Status N/A | | Disposition | Date/Time Stamp 4/18/2017 22:27 | Group ID |
| Car ID | | Location | | |
| Agency | | Agency ID PHX | | |
| | Created On 4/18/2017 22:29 | Created By VERSATERMTORMS | Updated On 4/18/2017 22:29 | Updated By VERSATERMTORMS |
| Comments | | | | |

# PHOENIX POLICE DEPARTMENT
## Calls for Service Data Sheet
### 201700672145

| Unit | | Unit Trip ID | | |
|---|---|---|---|---|
| A5 | | | | |
| Officer 1 | | | Officer 2 | |
| 07696: MATHEW   BOLIN | | | 07174: TIMOTHY   LANTZ | |
| Officer 3 | | | Officer 4 | |
| Status | | Disposition | Date/Time Stamp   Group ID | |
| N/A | | | 4/18/2017 22:27 | |
| Car ID | | Location | | |
| Agency | | Agency ID | | |
| | | PHX | | |
| | Created On | Created By | Updated On | Updated By |
| Comments | 4/18/2017 22:29 | VERSATERMTORMS | 4/18/2017 22:29 | VERSATERMTORMS |

| Unit | | Unit Trip ID | | |
|---|---|---|---|---|
| 724M | | | | |
| Officer 1 | | | Officer 2 | |
| 08409: SEAN   NOLLETTE | | | 09034: SETH   ZACHARIAS | |
| Officer 3 | | | Officer 4 | |
| Status | | Disposition | Date/Time Stamp   Group ID | |
| N/A | | | 4/18/2017 22:19 | |
| Car ID | | Location | | |
| Agency | | Agency ID | | |
| | | PHX | | |
| | Created On | Created By | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | 4/18/2017 22:24 | VERSATERMTORMS |

| Unit | | Unit Trip ID | | |
|---|---|---|---|---|
| 722K | | | | |
| Officer 1 | | | Officer 2 | |
| 08865: NICHOLAS   MILLER | | | | |
| Officer 3 | | | Officer 4 | |
| Status | | Disposition | Date/Time Stamp   Group ID | |
| N/A | | | 4/18/2017 22:13 | |
| Car ID | | Location | | |
| Agency | | Agency ID | | |
| | | PHX | | |
| | Created On | Created By | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | 4/18/2017 22:24 | VERSATERMTORMS |

# PHOENIX POLICE DEPARTMENT
## Calls for Service Data Sheet
### 201700672145

Page 5 of 7
04/21/2017 12:27

| Unit | | Unit Trip ID | | | |
|------|---|------|---|---|---|
| 711J | | | | | |
| Officer 1 | | | Officer 2 | | |
| 06956: CHAD    METCALF | | | | | |
| Officer 3 | | | Officer 4 | | |
| Status | | Disposition | Date/Time Stamp | Group ID | |
| N/A | | | 4/18/2017 22:18 | | |
| Car ID | | Location | | | |
| Agency | | Agency ID | | | |
| | | PHX | | | |
| | Created On | Created By | | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | | 4/18/2017 22:24 | VERSATERMTORMS |

| Unit | | Unit Trip ID | | | |
|------|---|------|---|---|---|
| 714T | | | | | |
| Officer 1 | | | Officer 2 | | |
| 10036: DAVID          HADLOCK | | | 09406: RODNEY    LOMIBAO | | |
| Officer 3 | | | Officer 4 | | |
| Status | | Disposition | Date/Time Stamp | Group ID | |
| N/A | | | 4/18/2017 22:22 | | |
| Car ID | | Location | | | |
| Agency | | Agency ID | | | |
| | | PHX | | | |
| | Created On | Created By | | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | | 4/18/2017 22:24 | VERSATERMTORMS |

| Unit | | Unit Trip ID | | | |
|------|---|------|---|---|---|
| 71J | | | | | |
| Officer 1 | | | Officer 2 | | |
| 05881: MATTHEW    VERTHEIN | | | | | |
| Officer 3 | | | Officer 4 | | |
| Status | | Disposition | Date/Time Stamp | Group ID | |
| N/A | | | 4/18/2017 22:19 | | |
| Car ID | | Location | | | |
| Agency | | Agency ID | | | |
| | | PHX | | | |
| | Created On | Created By | | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | | 4/18/2017 22:24 | VERSATERMTORMS |

PHOENIX POLICE DEPARTMENT
Calls for Service Data Sheet
201700672145

| Unit | | Unit Trip ID | | | |
|---|---|---|---|---|---|
| 714M | | | | | |
| Officer 1 | | | Officer 2 | | |
| 07977: ERIC   GOMEZ | | | 07242: BRIAN   WALKER | | |
| Officer 3 | | | Officer 4 | | |
| Status | | Disposition | Date/Time Stamp   Group ID | | |
| N/A | | | 4/18/2017 22:20 | | |
| Car ID | | Location | | | |
| Agency | | Agency ID | | | |
| | | PHX | | | |
| | Created On | Created By | | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | | 4/18/2017 22:24 | VERSATERMTORMS |

| Unit | | Unit Trip ID | | | |
|---|---|---|---|---|---|
| A5 | | | | | |
| Officer 1 | | | Officer 2 | | |
| 07696: MATHEW   BOLIN | | | 07174: TIMOTHY   LANTZ | | |
| Officer 3 | | | Officer 4 | | |
| Status | | Disposition | Date/Time Stamp   Group ID | | |
| N/A | | | 4/18/2017 22:20 | | |
| Car ID | | Location | | | |
| Agency | | Agency ID | | | |
| | | PHX | | | |
| | Created On | Created By | | Updated On | Updated By |
| Comments | 4/18/2017 22:24 | VERSATERMTORMS | | 4/18/2017 22:24 | VERSATERMTORMS |

## Reported Event Location

| Address | City | State | Zip |
|---|---|---|---|
| E MCDOWELL RD & N 44TH ST | PHOENIX | AZ | 85008 |

| Apt. Unit # | District | Post | Common Place |
|---|---|---|---|
| | 700: MOUNTAIN VIEW PRECINCT | 724: 724 | |

Directions

| Country Code | Sector | City Quadrant |
|---|---|---|
| US: UNITED STATES OF AMERICA (USA) | 72: 72 | 8: COUNCIL DISTRICT 8 |

| Reporting Area | County | Community Organization |
|---|---|---|
| | 07: MARICOPA | |

| Neighborhood | | Milepost | Recnum |
|---|---|---|---|
| | | | 102458060 |

| Map Grid | Longitude | Latitude | X | Y |
|---|---|---|---|---|
| BC38 | -111.987089300689 | 33.4656542569294 | 678524.345873574 | 896960.834603377 |

## User Fields

| Field 01 | Field 02 | Field 03 |
|---|---|---|
| Field 04 | Field 05 | Field 06 |
| Field 07 | Field 08 | Field 09 |
| Field 10 | Field 11 | Field 12 |

PHOENIX POLICE DEPARTMENT
Calls for Service Data Sheet
201700672145

Field 13                    Field 14

# EXHIBIT 5

# Don Shooter: Dispute with Ducey's office tied to expulsion, undercover surveillance

Yvonne Wingett Sanchez and Ryan Randazzo, The Republic | azcentral.com

. . .

Ducey spokesman Daniel Scarpinato confirmed that Shooter threatened to issue subpoenas over the contracts, but said Shooter was blaming others for his misdeeds.

. . .

Shooter has asked others to investigate the matter. A spokesman for the Arizona Attorney General's Office confirmed that Shooter met with agents from the office on Dec. 12.

"I can't comment on all the specifics," said spokesman Ryan Anderson. "But I can confirm that Shooter did, in fact, meet with agents from our office regarding a number of allegations," including procurement activities.

## Questions about technology contracts

Shooter's position as House Appropriations Committee chairman gave him an entree to people and information that others might not have had.

He said his dispute with the Governor's Office started two years ago, when he sponsored a bill, Senate Bill 1434, that would have required the state Department of Administration to find opportunities to save on technology costs.

That bill also required the state to solicit at least two bids on those contracts.

"The theory being that such budgetary oversight would encourage competition and make it harder to play games," Shooter wrote in his dossier, which was given to the media after his removal.

The bill passed both chambers easily, but Ducey vetoed it.

"This bill appears to add extra layers of bureaucracy that are unnecessary and will stall needed advancements in technology," Ducey wrote in his veto letter.

**EXHIBIT 6**

# RULES OF THE
# ARIZONA HOUSE OF REPRESENTATIVES
# 53rd LEGISLATURE
# 2017-2018

## RULE 1

### MEMBERS

A. The House may punish its members for disorderly behavior and may, with the concurrence of two-thirds of the members elected to the House, expel any member (Arizona Constitution, Article IV, Part 2, Section 11). A violation of any of the House Rules shall be deemed disorderly behavior. When a roll call vote is ordered on the floor of the House and subject to the provisions of Rules 6 and 14, members are required to vote after a reasonable time, as determined by the Chair, and may be punished for disorderly conduct if the member fails to vote after a reasonable time.

B. When any member shall be guilty of a breach of any of the Rules and Orders of the House, and the House has determined that he has so transgressed; he shall not be permitted to vote or speak, except by way of excuse for the same, until he has made satisfaction.

C. Any member having obtained leave of absence and having in his possession papers relative to business before the House shall leave same with the Chief Clerk.

---

## RULE 2

### ANNUAL SESSIONS

A. Except as provided herein, regular sessions shall be adjourned sine die no later than Saturday of the week in which the one hundredth day from the beginning of each regular session falls. The Speaker may by declaration authorize the extension of the session for a period not to exceed seven additional days. Thereafter the session can be extended only by a majority vote of the House.

B. If not considered in the regular session, the general appropriations bill, the general capital outlay bill and the university capital outlay bill may be considered each year in a special session which shall be called only for that purpose.

---

House and meetings to discuss matters, including those permitted in executive session as set forth in A.R.S. section 38-431.03. Each caucus shall establish procedures for convening political party caucuses.

---

## RULE 37

### DISCHARGE OF COMMITTEES

Notwithstanding any other provision of these rules to the contrary:

1. Every bill, resolution and memorial shall be referred to one or more standing committees, except death resolutions and Senate bills to be substituted on Third Reading pursuant to Rule 7 C.

2. Except as provided in paragraph 3, if three-fifths or more of the members of the House sign a petition to discharge all committees from further consideration of a bill, resolution or memorial the measure shall be placed on an Active Calendar of the Committee of the Whole within one week unless the House adjourns sine die. If the measure is reported favorably by the Committee of the Whole it shall be brought for Third Reading.

3. If three-fifths or more of the members of the House sign a removal request, a bill, resolution or memorial shall, irrespective of the measure's status, be removed from the possession of the Rules committee and shall be placed on an Active Calendar of the Committee of the Whole within one week unless the House adjourns sine die.

---

## RULE 38

### CODE OF CONDUCT

A. The House shall have a written code of conduct applicable to members. This code of conduct shall be adopted, and may be amended, upon vote of the majority of the members of the house.

B. The House shall have a written harassment prevention policy applicable to member behavior. This policy shall be adopted, and may be amended, upon vote of the majority of the members of the house.

# EXHIBIT 7

EDDIE FARNSWORTH
1700 WEST WASHINGTON, SUITE H
PHOENIX, ARIZONA 85007-2844
CAPITOL PHONE: (602) 926-5735
TOLL FREE: 1-800-352-8404
efarnsworth@azleg.gov

DISTRICT 12



COMMITTEES:
JUDICIARY & PUBLIC SAFETY,
CHAIRMAN
BANKING & INSURANCE,
VICE-CHAIRMAN
RULES

HOUSE ETHICS COMMITTEE
CHAIRMAN

## Arizona House of Representatives
### Phoenix, Arizona 85007

December 6, 2017

Representative Ray Martinez
Arizona House of Representatives
1700 W. Washington Street
Phoenix, AZ 85007

Re: Martinez Ethics Complaint Dated November 14, 2017

Dear Representative Martinez:

I am in receipt of your ethics complaint dated November 14, 2017. Pursuant to Rule 14, Rules of Procedure for the House Ethics Committee, I have reviewed the complaint and a copy of the complaint has been distributed to each member of the Committee and to Representative Rebecca Rios, the member who is the subject of the complaint.

You have been interviewed by outside counsel for the House of Representatives regarding the allegations. I have received a briefing from counsel regarding the interview. Reviewing the matter in consultation with attorneys for the House Ethics Committee, the majority of your complaint involves a political dispute that you perceive with Representative Rios regarding the 2018 election cycle and candidates for Legislative District 30. The complaint also makes reference to "inappropriate relationships" by Representative Rios. Based on the complaint and my briefing regarding your knowledge of events in the complaint, neither of these issues amounts to a violation of law, rule or policy.

House Rule 1 provides: "The House may punish its members for disorderly behavior and may, with the concurrence of two-thirds of the members elected to the House, expel any member (Arizona Constitution, Article IV, Part 2, Section 11). A violation of any of the House Rules shall be deemed disorderly behavior." A.R.S. § 38-519(E) in part states that "[a] member is subject to punishment or expulsion . . . for any violation of the code of ethics, conflict of interest or financial disclosure requirements." These are found in House Rules 34 and 35 respectively. There are no allegations in your complaint that could adequately support a claim of a violation of House Rule 34 or 35.

The Arizona Constitution does not specify the types of conduct that amount to "disorderly behavior" within the meaning of Article IV, Part 2, Section 11. Instead, the Constitution commends the application of that standard to the discretion of each chamber. To that end, the investigation of complaints against members is the purview of the Ethics Committee in each chamber. A.R.S. § 38-519(D). Each Ethics Committee, in turn, promulgates its own rules governing the complaint process. *See generally*, Rules of Procedure for the House Ethics Committee. Under our rules, not every complaint requires a hearing. Instead the investigation process is left to the discretion of the Ethics Committee Chairman.

Representative Ray Martinez
December 6, 2017
Page 2

Regarding allegations of conduct and the propriety of "relationships", the investigation process must safeguard an appropriate balance between individual liberty, privacy and the rule of law. I have concern for the process when the Ethics Committee may be invited down a path of inquiry into conduct not prohibited by law, rule or policy. Accordingly, under the Ethics Committee Rules, ethics complaints must be made based on facts within the personal knowledge of the individual making the complaint and given under oath. While your complaint is made under oath, you do not allege that your knowledge of "inappropriate relationships" complained of is due to your own observation of those events at the time they are alleged to have occurred. Instead, your complaint appears largely to be based upon information you have overheard from others. But even if you or any other individual did have first-hand knowledge of the "relationship" events alleged in your complaint, there has been no violation of a law, rule or policy.

In my opinion, your complaint to the Ethics Committee is about a political dispute. The matters you have presented do not meet the preliminary legal or evidentiary standard for Ethics Committee jurisdiction. I do not believe the inferences drawn and conclusions you make in your complaint are adequate to support a claim of a violation of a law, rule, policy or disorderly behavior. Further investigation and a hearing is not warranted and the matter is closed.

Sincerely,

Eddie Farnsworth
Chairman
House Ethics Committee

cc:
Speaker J.D. Mesnard
Representative Rebecca Rios
Jim Drake, Chief Clerk

# EXHIBIT 8

**From:**          Morgan, Craig <CMorgan@shermanhoward.com>
**Sent:**          Tuesday, January 30, 2018 10:04 AM
**To:**            Pasternak, Daniel B.
**Cc:**            Hesketh, Lindsay H. S.
**Subject:**       House Report

Dan,

In case we do not see or speak to each other today, I write to let you know that,  if your client desires to submit a written response to the Report, the Speaker asks that (1) the response be submitted in 5 business days (excluding today), and (2) be sent to Mr. Tim Fleming at the House.  His email address is: tfleming@azleg.gov.

Thanks,

Craig

CRAIG A. MORGAN - MEMBER

201 EAST WASHINGTON STREET
SUITE 800
PHOENIX, ARIZONA 85004
DIRECT: 602.240.3062 | CELL: 480.332.6321
cmorgan@shermanhoward.com | www.shermanhoward.com



SHERMAN&HOWARD

CONFIDENTIAL INFORMATION PROTECTED BY THE ATTORNEY-CLIENT AND/OR ATTORNEY WORK PRODUCT PRIVILEGES

This electronic mail  transmission and any attachments contain information belonging to the sender which may be confidential, proprietary, work product, and legally privileged.  This information is intended only for the use of the individual or entity to whom this electronic mail transmission was intended to be sent.  If you are not, or believe that you are not, the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited.  If you have, or believe you have, received this transmission in error, please immediately inform me by "reply" email and delete the erroneously received message.   Thank you.

**EXHIBIT 9**

# Arizona Republicans block vote to expel Rep. David Stringer after sex charges surface

**Dustin Gardiner, Arizona Republic**
Published 3:42 p.m. MT Jan. 28, 2019
Updated 6:26 p.m. MT Jan. 28, 2019


CONNECTTWEETLINKEDINCOMMENTEMAILMORE



Rep. David Stringer stands on the house floor with other members on Jan. 28, 2019. The Arizona House of Representatives refused to vote on a motion to expel Stringer over revelations that he was charged with sex offenses in 1983. *(Photo: Nick Oza/The Republic)*

. . .

Rep. Kelly Townsend, R-Mesa, filed an ethics complaint against Stringer on Monday. She said delaying the expulsion vote was about allowing the investigation to move forward.

"If we continue to go straight to expelling a member, one day it might be one of you," she said. "And you would prefer, I would think, to be able to have the opportunity to go through that process."

Townsend pushed for last year's vote to expel former Rep. Don Shooter, R-Yuma, who was accused of sexually harassing women. On Monday, she said she's realized "in retrospect it was the wrong process" to remove Shooter without an ethics hearing.

. . .

# EXHIBIT
# D

**In the Superior Court of the State of Arizona**
**in and for the County of Maricopa**

**CV2019-050782**                    .Y

(Please Type or Print)

CHRIS DEROSE, CLERK
BY
Is Interpreter Needed?  ☐ Yes ☒ No  *Valenzuela*  DEP
If yes, what language:
A. VALENZUELA, FILED

**19 JAN 29  PM 3: 47**

Plaintiff's Attorney  Thomas C. Horne, Esq.

Attorney Bar Number  002951

Plaintiff's Name(s): (List all)     Plaintiff's Address:          Phone #:          Email Address:
Donald M. Shoooter, c/o Horne Slaton, PLLC; 6720 N. Scottsdale Rd., Ste 285, Scottsdale, AZ 85253;

480-483-2178; Email: Horne@HorneSlaton.com

(List additional Plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)  State of Arizona;  Kirk and Janae Adams; Javan "J.D." and Holly Messard
(List additional Defendants on page two and/or attach a separate sheet)

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**

☐101 Non-Death/Personal Injury
☐102 Property Damage
☐103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐111 Negligence
☐112 Product Liability – Asbestos
☐112 Product Liability – Tobacco
☐112 Product Liability – Toxic/Other
☐113 Intentional Tort

☐114 Property Damage
☐115 Legal Malpractice
☐115 Malpractice – Other professional
☐117 Premises Liability
☐118 Slander/Libel/Defamation
☒116 Other (Specify)  **CIVIL RIGHTS**
**VIOLATION**

**120 MEDICAL MALPRACTICE:**

☐121 Physician M.D.   ☐123 Hospital
☐122 Physician D.O    ☐124 Other

**130 CONTRACTS:**

☐131 Account (Open or Stated)
☐132 Promissory Note
☐133 Foreclosure
☐138 Buyer-Plaintiff
☐139 Fraud
☐134 Other Contract (i.e. Breach of Contract)
☐135 Excess Proceeds-Sale
☐Construction Defects (Residential/Commercial)
　　　☐136 Six to Nineteen Structures
　　　☐137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

☐156 Eminent Domain/Condemnation
☐151 Eviction Actions (Forcible and Special Detainers)
☐152 Change of Name
☐153 Transcript of Judgment
☐154 Foreign Judgment
☐158 Quiet Title
☐160 Forfeiture
☐175 Election Challenge
☐179 NCC-Employer Sanction Action
　　　(A.R.S. §23-212)

Case No._____

☐ 180 Injunction against Workplace Harassment
☐ 181 Injunction against Harassment
☐ 182 Civil Penalty
☐ 186 Water Rights (Not General Stream Adjudication)
☐ 187 Real Property
☐ Special Action against Lower Courts
   (See Lower Court Appeal cover sheet in Maricopa)
☐ 194 Immigration Enforcement Challenge
   (A.R.S. §§1-501, 1-502, 11-1051)

**150-199 UNCLASSIFIED CIVIL:**

☐ Administrative Review
   (See Lower Court Appeal cover sheet in Maricopa)
☐ 150 Tax Appeal
   (All other tax matters must be filed in the AZ Tax
   Court)
☐ 155 Declaratory Judgment
☐ 157 Habeas Corpus
☐ 184 Landlord Tenant Dispute- Other
☐ 190 Declaration of Factual Innocence
   (A.R.S. §12-771)

☐ 191 Declaration of Factual Improper Party Status
☐ 193 Vulnerable Adult (A.R.S. §46-451)
☐ 165 Tribal Judgment
☐ 167 Structured Settlement (A.R.S. §12-2901)
☐ 169 Attorney Conservatorships (State Bar)
☐ 170 Unauthorized Practice of Law (State Bar)
☐ 171 Out-of-State Deposition for Foreign Jurisdiction
☐ 172 Secure Attendance of Prisoner
☐ 173 Assurance of Discontinuance
☐ 174 In-State Deposition for Foreign Jurisdiction
☐ 176 Eminent Domain– Light Rail Only
☐ 177 Interpleader– Automobile Only
☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
☐ 183 Employment Dispute- Discrimination
☐ 185 Employment Dispute-Other
☐ 196 Verified Rule 45.2 Petition
☐ 195(a) Amendment of Marriage License
☐ 195(b) Amendment of Birth Certificate
☐ 163 Other _____
   (Specify)

## RULE 26.2 DISCOVERY TIER or AMOUNT PLEADED:

(State the amount in controversy pleaded or place an "X" next to the discovery tier to which the pleadings allege the case
would belong under Rule 26.2.)

☒ Amount Pleaded $ excess of
compulsory arbitration limits         ___Tier 1   __XXX Tier 2__   ___Tier 3

### EMERGENCY ORDER SOUGHT

☐ Temporary Restraining Order      ☐ Provisional Remedy      ☐ OSC      ☐ Election Challenge
☐ Employer Sanction                ☐ Other (Specify)_____

## COMMERCIAL COURT (Maricopa County Only)

☐ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the
commercial Court. More information on the commercial Court, including the most recent forms, are available on the
Court's website at https://www.superiorcourt.maricopa.gov/commercial-court/.

**Additional Plaintiff(s):**

_____

_____

**Additional Defendant(s):**

_____

_____

_____

# EXHIBIT
# E



CLERK OF THE
SUPERIOR COURT
FILED
S. SZAKACS, DEP

2019 FEB 25 PM 3:55

1 | Thomas C. Horne No. 002951
**HORNE SLATON, PLLC**
2 | 6720 N. Scottsdale Road, Suite 285
Scottsdale, Arizona 85253
3 | (480)483-2178
(480)367-0691
4 | horne@horneslaton.com
*Attorneys for Plaintiff*

5 |

6 | ### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7 | ### IN AND FOR THE COUNTY OF MARICOPA

8 |

9 | DONALD M. SHOOTER, an individual,      **CASE NO.**   CV 2019-050782

Plaintiff,      **SUMMONS**

10 |

11 | vs.

12 | STATE OF ARIZONA;  KIRK and  JANAE
ADAMS, husband and wife; JAVAN
13 | "J.D." and HOLLY MESNARD, husband
and wife,
14 |

15 |      Defendant.

16 |

17 |

18 | TO THE ABOVE-NAMED DEFENDANT:

**Kirk Adams**
19 | **1110 North Alba Circle**
**Mesa Arizona 85213**

20 |

21 |      **YOU ARE HEREBY SUMMONED** and required to appear and defend, within

22 | the time applicable, in this action in this Court. If served within Arizona, you shall appear

23 | and defend within twenty (20) days after the service of the Summons and Complaint upon

24 | you, exclusive of the day of service.  If served out of the State of Arizona--whether by

25 |

direct service, by registered or certified mail, or by publication--you shall appear and

defend within thirty (30) days after the service of the Summons and Complaint upon you

is complete, exclusive of the day of service. Where process is served upon the Arizona

Director of Insurance as an insurer's attorney to receive service of legal process against it

in this state, the insurer shall not be required to appear, answer or plead until expiration of

forty (40) days after date of such service upon the Director.   Service by registered or

certified mail without the State of Arizona is complete thirty (30) days after the date of

filing the receipt and affidavit of service with the Court.  Service by publication is complete

thirty (30) days after the date of first publication.  Direct service is complete when made.

Service upon the Arizona Motor Vehicle Superintendent is complete thirty (30) days after

filing the Affidavit of Compliance and return receipt or Officer's Return.   Rule 4

Ariz.R.Civ.P. A.R.S. §§ 20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend

within the time applicable, judgment by default may be rendered against you for the relief

demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an

Answer or proper response in writing with the Clerk of this Court, accompanied by the

necessary filing fee, within the time required, and you are to serve a copy of any Answer

or response upon the Plaintiffs' attorney. Rule 10(d) Ariz.R.Civ.P. A.R.S. § 12-311, Rule

5 Ariz.R.Civ.P.

The name and address of Plaintiff's attorney is:

Thomas C. Horne, Esq.
**HORNE SLATON, PLLC**
6720 N. Scottsdale Rd., Suite 285
Scottsdale, AZ 85253

**REQUESTS FOR REASONABLE ACCOMMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE COURT BY PARTIES AT LEAST THREE (3) WORKING DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.**

JAN 29 2019

**SIGNED AND SEALED THIS DATE:** _____

JEFF FINE, CLERK

**DEPUTY CLERK** _____

A. Valenzuela
Deputy Clerk

Thomas C. Horne No. 002951
**HORNE SLATON, PLLC**
6720 N. Scottsdale Road, Suite 285
Scottsdale, Arizona 85253
(480)483-2178
(480)367-0691
horne@horneslaton.com
*Attorneys for Plaintiff*

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

# IN AND FOR THE COUNTY OF MARICOPA

CV 2019-050782

| | |
|---|---|
| DONALD M. SHOOTER, an individual, | **CASE NO.** |
| Plaintiff, | **SUMMONS** |
| vs. | |
| STATE OF ARIZONA;  KIRK and  JANAE ADAMS, husband and wife;  JAVAN "J.D." and HOLLY MESNARD, husband and wife, | |
| Defendant. | |

TO THE ABOVE-NAMED DEFENDANT:

**Janae Adams**
**1110 North Alba Circle**
**Mesa Arizona 85213**

**YOU ARE HEREBY SUMMONED** and required to appear and defend, within

the time applicable, in this action in this Court. If served within Arizona, you shall appear

and defend within twenty (20) days after the service of the Summons and Complaint upon

you, exclusive of the day of service.  If served out of the State of Arizona--whether by

direct service, by registered or certified mail, or by publication--you shall appear and

-1-

defend within thirty (30) days after the service of the Summons and Complaint upon you is complete, exclusive of the day of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of forty (40) days after date of such service upon the Director.   Service by registered or certified mail without the State of Arizona is complete thirty (30) days after the date of filing the receipt and affidavit of service with the Court.   Service by publication is complete thirty (30) days after the date of first publication.   Direct service is complete when made. Service upon the Arizona Motor Vehicle Superintendent is complete thirty (30) days after filing the Affidavit of Compliance and return receipt or Officer's Return.   Rule 4 Ariz.R.Civ.P. A.R.S. §§ 20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are to serve a copy of any Answer or response upon the Plaintiffs' attorney. Rule 10(d) Ariz.R.Civ.P. A.R.S. § 12-311, Rule 5 Ariz.R.Civ.P.

The name and address of Plaintiff's attorney is:

Thomas C. Horne, Esq.
**HORNE SLATON, PLLC**
6720 N. Scottsdale Rd., Suite 285
Scottsdale, AZ 85253

**REQUESTS FOR REASONABLE ACCOMMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE COURT BY PARTIES AT LEAST THREE (3) WORKING DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.**

**SIGNED AND SEALED THIS DATE:** _____



COPY

JAN **29** 2019

CLERK OF THE SUPERIOR COURT
A. VALENZUELA
DEPUTY CLERK

**DEPUTY CLERK**

-3-

CLERK OF THE
SUPERIOR COURT
FILED
S. SZAKACS, DEP

ORIGINAL 2019 FEB 25 PM 3: 56

1    Thomas C. Horne No. 002951
**HORNE SLATON, PLLC**
2    6720 N. Scottsdale Road, Suite 285
Scottsdale, Arizona 85253
3    (480)483-2178
(480)367-0691
4    horne@horneslaton.com
*Attorneys for Plaintiff*

5

6         **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7            **IN AND FOR THE COUNTY OF MARICOPA**

8

| | |
|---|---|
| **DONALD M. SHOOTER, an individual,** | **CASE NO.** CV 2019-050782 |
| Plaintiff, | **SUMMONS** |
| vs. | |
| **STATE OF ARIZONA; KIRK and JANAE ADAMS, husband and wife; JAVAN "J.D." and HOLLY MESNARD, husband and wife,** | |
| Defendant. | |

TO THE ABOVE-NAMED DEFENDANT:

**Javan J.D. Mesnard**
**1427 West Homestead Court**
**Chandler, Arizona 85286**

     **YOU ARE HEREBY SUMMONED** and required to appear and defend, within

the time applicable, in this action in this Court. If served within Arizona, you shall appear

and defend within twenty (20) days after the service of the Summons and Complaint upon

you, exclusive of the day of service. If served out of the State of Arizona--whether by

defend within thirty (30) days after the service of the Summons and Complaint upon you is complete, exclusive of the day of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of forty (40) days after date of such service upon the Director.  Service by registered or certified mail without the State of Arizona is complete thirty (30) days after the date of filing the receipt and affidavit of service with the Court.  Service by publication is complete thirty (30) days after the date of first publication.  Direct service is complete when made. Service upon the Arizona Motor Vehicle Superintendent is complete thirty (30) days after filing the Affidavit of Compliance and return receipt or Officer's Return.   Rule 4 Ariz.R.Civ.P. A.R.S. §§ 20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are to serve a copy of any Answer or response upon the Plaintiffs' attorney.  Rule 10(d) Ariz.R.Civ.P. A.R.S. § 12-311, Rule 5 Ariz.R.Civ.P.

The name and address of Plaintiff's attorney is:

Thomas C. Horne, Esq.
**HORNE SLATON, PLLC**
6720 N. Scottsdale Rd., Suite 285
Scottsdale, AZ 85253

**REQUESTS FOR REASONABLE ACCOMMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE COURT BY PARTIES AT LEAST THREE (3) WORKING DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.**

JAN 29 2019

**SIGNED AND SEALED THIS DATE:** _____

JEFF FINE, CLERK

_____
**DEPUTY CLERK**

A. Valenzuela
Deputy Clerk





CLERK OF THE
SUPERIOR COURT
FILED
S. SZAKACS, DEP

2019 FEB 25  PM 3: 56

1  Thomas C. Horne No. 002951
   **HORNE SLATON, PLLC**
2  6720 N. Scottsdale Road, Suite 285
   Scottsdale, Arizona 85253
3  (480)483-2178
   (480)367-0691
4  horne@horneslaton.com
   *Attorneys for Plaintiff*
5
                    **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
6
                        **IN AND FOR THE COUNTY OF MARICOPA**
7
                                                          CV 2019-050782
8
   **DONALD M. SHOOTER, an individual,**        **CASE NO.**
9
                        Plaintiff,               **SUMMONS**
10
11 vs.

12 **STATE OF ARIZONA;  KIRK and  JANAE
   ADAMS, husband and wife; JAVAN**
13 **"J.D." and HOLLY MESNARD, husband
   and wife,**
14
15                     Defendant.

16

17
   TO THE ABOVE-NAMED DEFENDANT:
18
                        **Holly Mesnard**
19                 **1427 West Homestead Court**
                    **Chandler, Arizona 85286**
20
        **YOU ARE HEREBY SUMMONED** and required to appear and defend, within
21
   the time applicable, in this action in this Court. If served within Arizona, you shall appear
22
23 and defend within twenty (20) days after the service of the Summons and Complaint upon

24 you, exclusive of the day of service.  If served out of the State of Arizona--whether by

25 direct service, by registered or certified mail, or by publication--you shall appear and

defend within thirty (30) days after the service of the Summons and Complaint upon you is complete, exclusive of the day of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of forty (40) days after date of such service upon the Director.  Service by registered or certified mail without the State of Arizona is complete thirty (30) days after the date of filing the receipt and affidavit of service with the Court.  Service by publication is complete thirty (30) days after the date of first publication.  Direct service is complete when made. Service upon the Arizona Motor Vehicle Superintendent is complete thirty (30) days after filing the Affidavit of Compliance and return receipt or Officer's Return.   Rule 4 Ariz.R.Civ.P. A.R.S. §§ 20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are to serve a copy of any Answer or response upon the Plaintiffs' attorney.  Rule 10(d) Ariz.R.Civ.P. A.R.S. § 12-311, Rule 5 Ariz.R.Civ.P.

The name and address of Plaintiff's attorney is:

Thomas C. Horne, Esq.
**HORNE SLATON, PLLC**
6720 N. Scottsdale Rd., Suite 285
Scottsdale, AZ 85253

**REQUESTS FOR REASONABLE ACCOMMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE COURT BY PARTIES AT LEAST THREE (3) WORKING DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.**

**SIGNED AND SEALED THIS DATE:**   JAN 29 2019
JEFF FINE, CLERK

**DEPUTY CLERK**

A. Valenzuela
Deputy Clerk



JEFF FINE, CLERK

CHRIS DEROSE, CLERK
RECEIVED CCB #2
DOCUMENT DEPOSITORY

**19 JAN 30 PH 2: 26**

**FILED**
**BY C. ANICETO, DEP**

1  Thomas C. Horne No. 002951
   **HORNE SLATON, PLLC**
2  6720 N. Scottsdale Road, Suite 285
   Scottsdale, Arizona 85253
3  (480)483-2178
   (480)367-0691
4  horne@horneslaton.com
   *Attorneys for Plaintiff*

5

6  **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

   **IN AND FOR THE COUNTY OF MARICOPA**
7

8  | DONALD M. SHOOTER, an individual, | **CASE NO.**  CV 2019-050782 |

9                    Plaintiff,          **SUMMONS**

10

11  vs.

12  STATE OF ARIZONA;  KIRK and  JANAE
    ADAMS, husband and wife;  JAVAN
13  "J.D." and HOLLY MESNARD, husband
    and wife,
14

15                    Defendant.

16

17
    TO THE ABOVE-NAMED DEFENDANT:
18
                    **State of Arizona**
19           **c/o Attorney General Mark Brnovich**
             **Arizona State Attorney General's Office**
20                  **2005 N Central Ave.**
                    **Phoenix, AZ 85004**
21

22

23       **YOU ARE HEREBY SUMMONED** and required to appear and defend, within

24  the time applicable, in this action in this Court. If served within Arizona, you shall appear

25  and defend within twenty (20) days after the service of the Summons and Complaint upon

you, exclusive of the day of service. If served out of the State of Arizona--whether by direct service, by registered or certified mail, or by publication--you shall appear and defend within thirty (30) days after the service of the Summons and Complaint upon you is complete, exclusive of the day of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of forty (40) days after date of such service upon the Director. Service by registered or certified mail without the State of Arizona is complete thirty (30) days after the date of filing the receipt and affidavit of service with the Court. Service by publication is complete thirty (30) days after the date of first publication. Direct service is complete when made. Service upon the Arizona Motor Vehicle Superintendent is complete thirty (30) days after filing the Affidavit of Compliance and return receipt or Officer's Return. Rule 4 Ariz.R.Civ.P. A.R.S. §§ 20-222, 28-502, 28-503.

**YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.

**YOU ARE CAUTIONED** that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this Court, accompanied by the necessary filing fee, within the time required, and you are to serve a copy of any Answer or response upon the Plaintiffs' attorney. Rule 10(d) Ariz.R.Civ.P. A.R.S. § 12-311, Rule 5 Ariz.R.Civ.P.

The name and address of Plaintiff's attorney is:

Thomas C. Horne, Esq.
**HORNE SLATON, PLLC**
6720 N. Scottsdale Rd., Suite 285
Scottsdale, AZ 85253

**REQUESTS FOR REASONABLE ACCOMMODATION FOR PERSONS WITH DISABILITIES MUST BE MADE TO THE COURT BY PARTIES AT LEAST THREE (3) WORKING DAYS IN ADVANCE OF A SCHEDULED COURT PROCEEDING.**

**SIGNED AND SEALED THIS DATE:** JAN 28 2019

JEFF FINE, CLERK

**DEPUTY CLERK**
A. Valenzuela
Deputy Clerk

# EXHIBIT
# F

**COPY**

JAN **29** 2019



CLERK OF THE SUPERIOR COURT
A. VALENZUELA
DEPUTY CLERK

1   Thomas C. Horne No. 002951
**HORNE SLATON, PLLC**
2   6720 N. Scottsdale Road, Suite 285
Scottsdale, Arizona 85253
3   (480)483-2178
(480)367-0691
4   horne@horneslaton.com
*Attorneys for Plaintiff*

5

6   **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**
7

8   | | |
DONALD M. SHOOTER, an individual,

9                                         CASE NO.   CV2019-050762
            Plaintiff,
10                                        **CERTIFICATE OF COMPULSORY**
vs.                                       **ARBITRATION**
11

12   STATE OF ARIZONA;  KIRK and  JANAE
ADAMS, husband and wife;  JAVAN
13   "J.D." and HOLLY MESNARD, husband
and wife,
14

15            Defendant.

16

17        Plaintiff certifies that the largest award sought by the complainant, including punitive

18   damages, but excluding interest, attorneys' fees, and costs does exceed limits set by Local Rule

19   for compulsory arbitration. This case is not subject to compulsory arbitration as provided in

20   Rules 72 through 77 of the Rules of Civil Procedure.
21

22        **RESPECTFULLY SUBMITTED** January 29, 2018.

23

24                              By: _____

25                                   Thomas C. Horne, Esq.
                                     *Attorney for Plaintiff*

-1-

# EXHIBIT
# G

1   Thomas C. Horne, Bar No. 002951
    **HORNE SLATON, PLLC**
2   6720 North Scottsdale Road, Suite 285
    Scottsdale, AZ 85253
3   Tel: (480) 483-2178
    Fax: (480) 367-0691
4   Email: horne@horneslaton.com
    *Attorney for Plaintiff*
5





JAN **29** 2019

CLERK OF THE SUPERIOR COURT
A. VALENZUELA
DEPUTY CLERK

6          **IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA**

7              **IN AND FOR THE COUNTY OF MARICOPA**

8                                                    CV 2019-050782

9   **DONALD M. SHOOTER, an individual,**      **CASE NO.**

10                  Plaintiff,                  **DEMAND FOR JURY TRIAL**

11  vs.

12  **STATE OF ARIZONA;  KIRK and  JANAE**
    **ADAMS, husband and wife; JAVAN**
13  **"J.D." and HOLLY MESNARD, husband**
    **and wife,**
14

15                  Defendant.

16

17

18          Plaintiff demands a trial by jury in this case. If this is sent to compulsory

19  arbitration, Plaintiff demands a trial by jury if there is an appeal from that

20  compulsory arbitration.

21          **RESPECTFULLY SUBMITTED** January 29, 2108.

22

23                                          **HORNE SLATON, PLLC**

24                                          By: _____
                                            Thomas C. Horne, Esq.
25                                          *Attorney for Plaintiff*

# EXHIBIT H



CLERK OF THE
SUPERIOR COURT
FILED
S. SZAKACS, DEP

2019 FEB 25 PM 3: 55

**AFFIDAVIT OF SERVICE**

| Case:<br>CV2019-050782 | Court:<br>Superior Court of The State of Arizona | County:<br>Maricopa County | Job:<br>3105395 (Reference: Donald M. Shooter) |
|---|---|---|---|
| Plaintiff / Petitioner:<br>Donald M. Shooter, an individual | | Defendant / Respondent:<br>State Of Arizona; Kirk and Janae Adams, husband and wife; Javan<br>"J.D." and Holly Mesnard, husband and wife | |
| Received by:<br>Quick Courier, LLC | | For:<br>Home Slaton, PLLC | |
| To be served upon:<br>Janae Adams for her self and on behalf of her husband Kirk Adams | | | |

I, Jack Piraino II, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Janae Adams for her self and simultaneously on behalf of her husband Kirk Adams, Home: 1110 N Alba Cir, Mesa, AZ 85213

**Manner of Service:** Personal/Individual, Feb 10, 2019, 4:09 pm MST

**Documents:** Summons (Received Jan 29, 2019 at 2:00pm MST), Demand For Jury Trial, Certificate Of Compulsory Arbitration, Complaint (Civil Rights Violation, Including Violation of 42 U.S.C. §1983, Defamation, False Light Invasion of Privacy, and Aiding and Abbetting and Conspiracy, and Wrongful Termination) - Jurry Trial Demanded

**Additional Comments:**
1) Successful Attempt: Feb 10, 2019, 4:09 pm MST at Home: 1110 N Alba Cir, Mesa, AZ 85213 received by Janae Adams for her self and simultaneously on behalf of her husband Kirk Adams. Age: 40-50; Ethnicity: Caucasian; Gender: Female; Weight: 135-145; Height: 5'7"; Hair: Blond; Eyes: Blue;
I arrived at the aforementioned home address for Mr. and Mrs. Adams and rang the doorbell. Shortly thereafter, a Caucasian female came to the door. I asked if she was Mrs. Janae Adams, to which she responded in the affirmative. I informed her that I had legal paperwork to serve to her for herself and her husband Mr. Kirk Adams, and confirmed with her that Mr. Adams was, in fact, her husband and that he lived at the abode with her. I handed her two copies of each aforementioned document, one for herself and the second for her husband, and briefly explained their contents. Mrs. Adams verbally and physically accepted service for both herself and Mr. Kirk Adams. Subsequently, I departed the area.

_____   02/25/2019
Jack Piraino II                              Date
Maricopa County 8700

Quick Courier, LLC
202 E Earll Dr Suite 425
Phoenix, AZ 85012



*CLERK OF THE
SUPERIOR COURT
FILED
S. SZAKACS, DEP

2019 FEB 25 PM 3: 55

**AFFIDAVIT OF SERVICE**

| Case: | Court: | County: | Job: |
|---|---|---|---|
| CV2019-050782 | Superior Court of The State of Arizona | Maricopa County | 3105430 (Reference: Donald M. Shooter) |

| Plaintiff / Petitioner: | Defendant / Respondent: |
|---|---|
| Donald M. Shooter, an individual | State Of Arizona; Kirk and Janae Adams, husband and wife; Javan "J.D." and Holly Mesnard, husband and wife |

| Received by: | For: |
|---|---|
| Quick Courier, LLC | Home Slaton, PLLC |

| To be served upon: |
|---|
| Mr. Javan "J.D." Mesnard for himself and simultaneously on behalf of his wife Mrs. Holly Mesnard |

I, Jack Piraino II, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| Recipient Name / Address: | Mr. Javan "J.D." Mesnard for himself and simultaneously on behalf of his wife Mrs. Holly Mesnard, Arizona State Senate Building: 1700 W Washington St, Phoenix, AZ 85007 |
|---|---|
| Manner of Service: | Personal/Individual, Feb 21, 2019, 2:24 pm MST |
| Documents: | Summons (Received Jan 29, 2019 at 2:00pm MST), Demand For Jury Trial, Certificate Of Compulsory Arbitration, Complaint (Civil Rights Violation, Including Violation of 42 U.S.C. §1983, Defamation, False Light Invasion of Privacy, and Aiding and Abbetting and Conspiracy, and Wrongful Termination) - Jury Trial Demanded |

**Additional Comments:**
1) Successful Attempt: Feb 21, 2019, 2:24 pm MST at Arizona State Senate Building: 1700 W Washington St, Phoenix, AZ 85007 received by Mr. Javan "J.D." Mesnard for himself and simultaneously on behalf of his wife Mrs. Holly Mesnard. Age: 35-40; Ethnicity: Caucasian; Gender: Male; Weight: 160-170; Height: 5'9"; Hair: Brown; Eyes: Brown;
With prior knowledge that Mr. Javan "J.D." Mansard is an Arizona State Senator and that the State Senate were gathering for a hearing at 1:30 pm MST on February 21st, 2019, I arrived at the aforementioned address at approximately 1:15 pm MST and proceeded to State Senate building. I spoke with the guard on the first floor and informed him I was there to serve Mr. Mesnard legal paperwork. He directed me to the third floor to speak with the guard there. I proceeded to the third floor, spoke with that guard, and informed her as well, why I was there. She made a call to Mr. Mesnard's assistant and then hung up the phone. The guard informed me that Mr. Mesnard's assistant was going to get back to her. Approximately five minutes later, she answered a call, spoke for a minute or so, and hung up. The guard informed me that Mr. Mesnard was already on the Senate floor and likely wouldn't be able to come out until after the hearing, but that I was welcome to wait in the lobby on that floor. I sat down and proceeded to wait. At around 2:15 pm MST the Senate hearing ended and at 2:24 pm MST Mr. Mesnard emerged from the back of the building on the third floor and met me near the guard's desk. He introduced himself as Senator "J.D" Mesnard. I informed him that I was there to serve him legal paperwork, handed him a copy of each document reference herein, and briefly described their contents. I also informed him that I had an additional copy of each document that needed to be served to his wife Mrs. Holly Mesnard. I asked if he would like to accept on her behalf or if he would prefer I continue to make attempts at their home to serve her personally. Mr. Mesnard indicted that he would accept the extra set of documents for his wife at that time. Mr. Javan "J.D." Mesnard verbally and physically accepted service for himself and on behalf of his wife. Subsequently, I departed the area.

_____  02/25/2019
Jack Piraino II                          Date
Maricopa County 8700

Quick Courier, LLC
202 E Earll Dr Suite 425
Phoenix, AZ 85012

JEFF FINE, CLERK

CHRIS DEROSE, CLERK
RECEIVED CCB #2
DOCUMENT DEPOSITORY

19 JAN 30 PH 2: 26

**AFFIDAVIT OF SERVICE**

FILED
BY C. ANICETO, DEP

| Case:<br>CV2019-050782 | Court:<br>Superior Court of The State of Arizona | County:<br>Maricopa County | Job:<br>3023930 (Reference: Donald M. Shooter) |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>Donald M. Shooter, an individual | | **Defendant / Respondent:**<br>State Of Arizona; Kirk and Janae Adams, husband and wife; Javan<br>"J.D." and Holly Mesnard, husband and wife | |
| **Received by:**<br>Quick Courier, LLC | | **For:**<br>Horne Slaton, PLLC | |
| **To be served upon:**<br>State Of Arizona c/o Attorney General Mark Brnovich at the Arizona State Attorney General's Office | | | |

I, Jack Piraino II, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** State Of Arizona c/o Attorney General Mark Brnovich via Lisa Fischer, Lobby Receptionist for the Arizona State Attorney General's Office, The Arizona State Attorney General's Office: 2005 N Central Ave, Phoenix, AZ 85004

**Manner of Service:** Government Agency, Jan 30, 2019, 12:29 pm MST

**Documents:** Summons (Received Jan 29, 2019 at 2:00pm MST), Demand For Jury Trial, Certificate Of Compulsory Arbitration, Complaint (Civil Rights Violation, Including Violation of 42 U.S.C. §1983, Defamation, False Light Invasion of Privacy, and Aiding and Abetting and Conspiracy, and Wrongful Termination) - Jury Trial Demanded

**Additional Comments:**
1) Successful Attempt: Jan 30, 2019, 12:29 pm MST at The Arizona State Attorney General's Office: 2005 N Central Ave, Phoenix, AZ 85004 received by State Of Arizona c/o Attorney General Mark Brnovich via Lisa Fischer, Lobby Receptionist for the Arizona State Attorney General's Office. Age: 50-60; Ethnicity: Caucasian; Gender: Female; Weight: 150-160; Height: 5'3"; Hair: Gray; Eyes: Brown;
I arrived at the aforementioned address for Arizona Attorney General Mark Brnovich with the State of Arizona Attorney General's Office and spoke with Lisa Fischer, Lobby Receptionist and an individual authorized to accept service on behalf of Attorney General Mark Brnovich. I informed her I was service Mr. Brnovich for the State of Arizona, handed her a copy of all aforementioned documents, and briefly described their contents. Mrs. Fischer verbally and physically accepted service and date and time stamped the summons.

_____  01/30/2019
Jack Piraino II                   Date
Maricopa County 8700

Quick Courier, LLC
202 E Earll Dr Suite 425
Phoenix, AZ 85012

# EXHIBIT
# I

1

<u>VERIFICATION</u>

2

3      I, Daniel P. Quigley, declare under penalty of perjury that the following is true and correct.

4      1.      I am a partner in the law firm Cohen Dowd Quigley P.C., and have been admitted to

5  practice law in the State of Arizona since 1984.  I am one of the attorneys for Defendants Kirk and

6  Janae Adams in connection with the litigation captioned *Donald Shooter v. State of Arizona, et al.*,

7  which is currently pending in the Superior Court of Arizona in Maricopa County, Case No.

8  CV2019-050782 (the "Litigation").  I am competent to testify to the matters contained in this

9  Verification.

10      2.      The pleadings and other documents previously filed in the Litigation and attached as

11  Exhibits C through H to the Joint Notice of Removal are true and complete copies of all pleadings

12  and other documents filed in the Litigation.

13      EXECUTED this 11th day of March, 2019.

14

15

16      _____
        DANIEL P. QUIGLEY

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT
# J

1 | COHEN DOWD QUIGLEY
2 | The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona  85016
3 | Telephone 602•252•8400

4 | Ronald Jay Cohen (003041)
5 | Email: rcohen@CDQLaw.com
Daniel P. Quigley (009809)
6 | Email:  dquigley@CDQLaw.com
Betsy J. Lamm (025587)
7 | Email:  blamm@CDQLaw.com
Lauren M. LaPrade (029860)
8 | Email:  llaprade@CDQLaw.com
9 | Attorneys for Defendants Kirk and Janae Adams

10

11 | **ARIZONA SUPERIOR COURT**

12 | **MARICOPA COUNTY**

13 | DONALD M. SHOOTER, an individual,    |    Case No:  CV2019-050782

14 |                          Plaintiff,

15 | vs.                                                          |    **NOTICE OF FILING JOINT**
**NOTICE OF REMOVAL**
16 |
17 | STATE OF ARIZONA; KIRK and JANAE
ADAMS, husband and wife; JAVAN "J.D."
18 | and HOLLY MESNARD, husband and wife,

19 |                          Defendants.

20

21 |         Defendants Kirk and Janae Adams ("the Adams") and Javan "J.D." and Holly

22 | Mesnard ("the Mesnards") give notice to the Clerk of the Maricopa County Superior Court

23 | and Plaintiff Donald Shooter that the Adams and the Mesnards are jointly removing this

24 | action to the United States District Court for the District of Arizona pursuant to 28 U.S.C.

25 | §§ 1331, 1441 and 1446, as the Complaint asserts a claim arising under federal law.  A copy

26 | of the Joint Notice of Removal is attached as Exhibit 1.

RESPECTFULLY SUBMITTED this 11th day of March, 2019.

**COHEN DOWD QUIGLEY**
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
  Attorneys for Kirk and Janae Adams

By:    /s/ Daniel P. Quigley
       Ronald Jay Cohen
       Daniel P. Quigley
       Betsy J. Lamm
       Lauren M. LaPrade

HINSHAW & CULBERTSON LLP
2375 East Camelback Road, Suite 750
Phoenix, Arizona 85016
  Attorney for Javan "J.D." and Holly Mesnard

By:    /s/ Stephen W. Tully (with permission)
       Stephen W. Tully

ORIGINAL of the foregoing was
filed with the Clerk of the Court
on March 11, 2019, with a COPY
sent via the E-Filing System to:

Honorable Theodore Campagnolo
**MARICOPA COUNTY SUPERIOR COURT**
Northeast Regional Center – G/102
18380 North 40th Street
Phoenix, Arizona  85032

And a COPY sent via electronic and
U.S. mail on March 11, 2019 to:

Thomas C. Horne
**HORNE SLATON, PLLC**
6720 North Scottsdale Road, Suite 285
Scottsdale, Arizona  85253
  *Attorney for Donald M. Shooter*

2

Michael Tryon
Stephanie Elliott
Jeremy Horn
**OFFICE OF THE ATTORNEY GENERAL**
2005 North Central Avenue
Phoenix, Arizona  85004
  *Attorneys for State of Arizona*

Stephen W. Tully
**HINSHAW & CULBERTSON LLP**
2375 East Camelback Road, Suite 750
Phoenix, Arizona  85016
  *Attorney for Javan "J.D." and Holly Mesnard*

*/s/ Jennifer Wootten*

COHEN DOWD QUIGLEY

3