**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Donald M. Shooter,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>State of Arizona, et al.,<br><br>　　　　　Defendants. | No. CV-19-01671-PHX-DWL<br><br>**ORDER** |

Pending before the Court are motions to dismiss by Defendants Kirk Adams ("Adams") (Doc. 12), J.D. Mesnard ("Mesnard") (Doc. 16), and the State of Arizona ("the State") (Docs. 13, 21).[1] For the reasons that follow, the Court will grant these motions with respect to Plaintiff Don Shooter's ("Shooter") § 1983 claim and will remand Shooter's remaining state-law claims to state court.

## BACKGROUND

I. <u>Factual Background</u>

On February 1, 2018, the Arizona House of Representatives voted 56-3 to expel one of its members, Shooter, following the release of a report addressing allegations of sexual harassment and other inappropriate conduct by him. In this lawsuit, Shooter contends his expulsion was the result of a conspiracy between the Speaker of the Arizona House of Representatives (Mesnard), the Arizona Governor's Chief of Staff (Adams), the State, and

---
[1] Adams, Mesnard, and the State will be referred to collectively in this order as "Defendants."

certain non-parties to suppress his attempts to expose corruption in the State's use of no-bid contracts. The facts alleged by Shooter, which the Court assumes to be true for purposes of the pending motions, are as follows.

Shooter alleges he "began to discover questionable practices related to State expenditures on technology" when he was the Chairman of the Senate Appropriations Committee. (Doc. 1-3 at 7 ¶ 6.)[2] Shooter further alleges he "found a concerted effort at the Department of Administration to direct work to specific, high priced, out-of-state companies by avoiding competition at the expense of Arizona workers and employers, and to the detriment of Arizona taxpayers." (*Id.* at 9 ¶ 17.)

To combat this purportedly shady dealing, Shooter introduced SB 1434—legislation that would address these concerns. (*Id.* at 10 ¶¶ 19-20.) The bill, however, was vetoed. (*Id.* at 10 ¶ 23.) Shooter pressed forward, reintroducing the bill in the next session. (*Id.* at 11 ¶ 24.) Representatives from the Governor's Office informed him the bill would once again be vetoed. (*Id.*) Nevertheless, Shooter continued his efforts to get the bill passed. (*Id.* ¶ 27.)

Shooter alleges his efforts coincided with harassment by Defendants. For example, Shooter contends he was "surveilled and followed by a private investigator." (*Id.* ¶ 29.) Also, each time Shooter would voice objections to Adams, who was the Governor's Chief of Staff, "a local television reporter would show up at the legislature with a camera man and aggressively follow and film Mr. Shooter, then run a story derisive of Mr. Shooter." (*Id.* at 12 ¶ 32.)

On November 1, 2017, Shooter told Adams "that he planned to use his subpoena power, granted to him as Chair of the House Appropriations Committee, to gain additional insight into the irregularities in the procurement process at the start of the next legislative session unless there was some movement to address the continued improper use of expensive, no bid contracts." (*Id.* at 13-14 ¶ 41.) In an effort to dissuade Shooter from

---

[2] Shooter began serving in the Arizona Senate in 2010 and switched to the Arizona House of Representatives in 2016.

these plans, Adams is alleged to have directed Representative Michelle Ugenti-Rita ("Ugenti-Rita") "to misconstrue[ ] [her] past friendship with . . . Shooter, as the basis for allegations of past sexual harassment by . . . Shooter." (*Id.* at 16 ¶¶ 55, 57.) Ugenti-Rita made these statements in a media interview on November 7, 2017. (*Id.* ¶ 54.)

After Ugenti-Rita's interview, the Speaker of the House of Representatives—Mesnard—is alleged to have "began the process, in coordination with Adams and another member of the Governor's Office, of inhibiting and discrediting . . . Shooter." (*Id.* ¶ 58.) Among other things, Mesnard pressured Shooter to resign. (*Id.* ¶ 60.)

Shooter didn't resign, instead asking for a complete investigation into the allegations against him. (*Id.* at 17 ¶ 62.) Shooter also asked the House to investigate allegations against Ugenti-Rita. (*Id.* ¶ 63.) In response, Mesnard appointed "a hand-selected committee of *his staff* to investigate the allegations" against Shooter and Ugenti-Rita. (*Id.* at 18 ¶ 68, italics in complaint.) Then, the hand-selected committee hired the law firm of Sherman & Howard to conduct the investigation into Shooter and Ugenti-Rita. (*Id.* at 19 ¶ 72.) This, Shooter alleges, was "the first time in the Arizona Legislature's history" that a "special investigation team" was appointed, rather than an Ethics or Special Committee being convened. (*Id.* at 27 ¶ 120.)

Shooter alleges that Mesnard gave preferential treatment to Ugenti-Rita throughout the investigation. For example, Mesnard suspended Shooter from his position as Chairman of the House Appropriations Committee (*id.* at 18 ¶ 69) but didn't suspend Ugenti-Rita from her position as Chair of the House Ways and Means Committee (*id.* at 19 ¶ 76). Additionally, Mesnard repeatedly asked Shooter to resign but didn't ask Ugenti-Rita to resign. (*Id.* at 19-20 ¶¶ 77-78.) Further, Mesnard agreed to pay a portion of the attorneys' fees incurred by Shooter, Ugenti-Rita, and Representative Rebecca Rios ("Rios") resulting from ethics investigations[3] but "immediately requested . . . Shooter not accept the offer." (*Id.* at 20-21 ¶¶ 82, 83.) Mesnard also paid Ugenti-Rita's attorney twenty-five percent

---

[3] An ethics complaint had been filed against Rios, making her the third legislator under investigation. (Doc. 1-3 at 20-21 ¶ 82.)

more than he paid Shooter's or Rios's attorneys. (*Id.* at 21 ¶ 84.) Finally, Mesnard unilaterally created a "zero-tolerance" policy related to sexual harassment, which he applied to Shooter but not to Ugenti-Rita or Rios. (*Id.* at 22 ¶ 92.)

Sherman & Howard ultimately issued a report determining that some of the allegations against Shooter were true. (*Id.* at 32 ¶ 136.) In contrast, the report concluded there was "no credible evidence" that Ugenti-Rita had "violated the Policy." (*Id.* ¶ 137.) Sixty-five of the seventy-five pages were dedicated to the investigation of the allegations against Shooter, while only one-and-a-half pages concerned the allegations against Ugenti-Rita. (*Id.* ¶¶ 135, 137.) Also, the report released to the public omitted "evidence of sexual misconduct by Ugenti-Rita [that] was far more egregious than any allegation against . . . Shooter," yet Ugenti-Rita was never disciplined. (*Id.* at 32-33 ¶¶ 139, 141.)

Four days after the report was disseminated to House members, the House voted to expel Shooter. (*Id.* at 28-29 ¶ 123.) Shooter had been told "he was entitled to five days to provide a written response to the investigative report," so the accelerated vote meant he wasn't given "the opportunity to meaningfully defend himself in a hearing before his peers." (*Id.*)

Shooter alleges that each of the actions by Mesnard and Adams was "undertaken to prevent . . . Shooter from issuing subpoenas and thereby making evident, high-level corruption." (*Id.* at 31 ¶ 134.)

II. <u>Procedural Background</u>

On January 29, 2019, Shooter filed this lawsuit in the Maricopa County Superior Court. (Doc. 1-3 at 5-46.) The complaint asserts four causes of action: (1) violation of Shooter's due process and equal protection rights, asserted through 42 U.S.C. § 1983; (2) defamation and aiding and abetting, and conspiracy to commit defamation; (3) false light invasion of privacy and aiding and abetting, and conspiracy to commit false light invasion of privacy; and (4) wrongful termination. (*Id.* at 42-45.)[4]

---

[4] The spouses of Adams and Mesnard are named as defendants in the complaint for the sole purpose of preserving claims against their respective marital communities.

- 4 -

On March 11, 2019, Adams removed the case to this Court with the consent of the State. (Doc. 1.)

On March 18, 2019, Adams filed a motion to dismiss for failure to state a claim. (Doc. 12.)

On March 18, 2019, the State joined the motion filed by Adams. (Doc. 13.)

On March 29, 2019, Mesnard filed a motion to dismiss for failure to state a claim. (Doc. 16.)

On April 19, 2019, the State joined the motion filed by Mesnard. (Doc. 21.)

On June 5, 2019, the Court heard oral argument.

**LEGAL STANDARD**

"[T]o survive a motion to dismiss, a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

**DISCUSSION**

I.  Federal Claim: § 1983 Violation

The complaint asserts only one federal cause of action—a claim under 42 U.S.C. § 1983 premised on the allegation that Defendants, while acting under color of state law, "deprived Shooter of his rights to due process and equal protection." (Doc. 1-3 at 42-43 ¶¶ 179-185.) The complaint explains: "The actions taken to expel . . . Shooter deprived him of a protected liberty interest . . . . Shooter lost his seat and was defamed at the same

time. An individual who is terminated by the government has a protected liberty interest that is compensable if that individual is libeled at the same time." (*Id.* at 43 ¶ 184.) The complaint specifically alleges that Shooter was entitled to the following processes: (1) a hearing (*id.* at 39 ¶ 168); (2) the "right to examine his accusers and confront the witnesses against him" (*id.* at 38 ¶ 162); (3) "the protections of the traditional Ethics Committee," rather than the special investigation team composed of Mesnard's staff (*id.* ¶ 164); and (4) access to "the complete investigative file including the investigators' notes describing the testimony of material witnesses" (*id.* ¶ 165).[5]

### A. **Motions To Dismiss**

Adams moves to dismiss Shooter's § 1983 claim on the following grounds: (1) Shooter's challenge to his expulsion from the House raises a nonjusticiable political question; (2) to the extent Shooter's complaint challenges any actions taken in the House, those claims are barred by the doctrine of absolute legislative immunity; (3) Shooter's claims are barred by qualified immunity because Shooter hasn't demonstrated that Adams violated "a clearly established, particularized constitutional right"; and (4) Shooter hasn't plausibly alleged that Adams violated any of Shooter's rights. (Doc. 12.)

Similarly, Mesnard moves to dismiss Shooter's § 1983 claim because: (1) Mesnard, as a legislator, is absolutely immune from suit for damages arising from his official conduct; (2) Shooter doesn't state a claim that his due process or equal protection rights were violated; and (3) to the extent Shooter uses § 1983 to assert state constitutional rights, § 1983 isn't the proper mechanism to do so. (Doc. 16.) Additionally, Mesnard "join[s] in the arguments of Co-Defendants Kirk and Janae Adam's Motion to Dismiss." (*Id.* at 1.)

The State joins in the arguments presented by Adams and Mesnard (Docs. 13, 21) and additionally seeks dismissal of the § 1983 claim because the State isn't a "person"

---

[5] In contrast, the complaint doesn't elaborate on Shooter's equal protection theory. Additionally, Shooter focused solely on his due process theory in his response to Defendants' motions and at oral argument. Thus, the Court considers his equal protection claim abandoned. Moreover, Shooter's overarching theory is that he was targeted due to his efforts to expose wasteful state spending, not due to his membership in a protected class.

within the meaning of § 1983 (Doc. 13 at 2).

B. **Analysis**

As an initial matter, Shooter's § 1983 claim against the State must be dismissed. "Section 1983 provides a cause of action against any 'person' who, under color of law, deprives any other person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 983 (9th Cir. 2002). The State isn't a "person" within the meaning of § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) ("For the reasons that follow, we reaffirm . . . that a State is not a person within the meaning of § 1983."); *Hale v. State of Ariz.*, 993 F.2d 1387, 1398 (9th Cir. 1993) ("[A] state is not 'person' within the meaning of § 1983."); *Jenkins v. Washington*, 46 F. Supp. 3d 1110, 1115 (W.D. Wash. 2014) ("[A] state is not a 'person' for § 1983 purposes regardless of the nature of relief sought.").

As for Adams and Mesnard, the Court could possibly find in their favor for several reasons. However, the clearest and narrowest path forward is qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates "clearly established" law when "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (citation omitted). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'"

*LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted). "If that burden is satisfied, the defendant must prove that his conduct was 'reasonable.'" *Stroh*, 205 F.3d at 1157 (citation omitted).

Here, both Adams and Mesnard have raised qualified immunity as a defense. Thus, Shooter bears the burden of showing that Defendants violated "clearly established" law.

Shooter utterly fails to carry this burden. Indeed, in response to Adams's argument that he didn't violate "clearly established" law, Shooter merely "incorporate[d] . . . by reference" the case law cited in a different section of Shooter's response brief. (Doc. 15 at 11.) Yet those cases were cited by Shooter to address whether a challenge to a legislative body's expulsion of a member presents a justiciable controversy. (*Id.*) The issue of justiciability is entirely different from the issue of whether, and to what extent, the Due Process and Equal Protection Clauses of the Fourteenth Amendment apply in this context.

For example, the cross-referenced section of Shooter's brief cites *Sweeney v. Tucker*, 375 A.2d 698 (Pa. 1977). There, Leonard A. Sweeney—a former member of the Pennsylvania House of Representatives—challenged his expulsion from the House on due process grounds. *Id.* at 700. Notably, Sweeney was afforded much less process before his expulsion than Shooter was afforded here. The Pennsylvania House didn't, for example, commission a law firm to conduct an investigation—it simply notified Sweeney by telegram that his "future status" was in doubt, then held a vote nine days later (which Sweeney didn't attend) during which Sweeney's colleagues voted 176-1 to expel him. *Id.* at 700-02. In the ensuing lawsuit, Sweeney contended he possessed a property interest in his House seat and was deprived of that interest without due process of law. *Id.* at 712-13. The defendants, in turn, argued Sweeney's expulsion wasn't reviewable under the Pennsylvania Constitution's Speech or Debate Clause and the political question doctrine. *Id.* at 703. Although the Supreme Court of Pennsylvania rejected those justiciability arguments, *id.* at 703-12, it ruled against Sweeney on the merits, *id.* at 712-13. Specifically,

the court held: "Even assuming Sweeney's interest is entitled to procedural protections, we are convinced that his rights have not been violated . . . . Given the circumscribed nature of a legislator's private interest in his elected office and the overriding need for the Legislature to protect its integrity through the exercise of the expulsion power, it may be that the requirement of a two-thirds vote to expel itself satisfies procedural due process." *Id.* at 713. Here, the margin of the vote to expel Shooter—56 to 3—easily surpassed a two-thirds threshold.[6] It is therefore difficult to understand how Shooter could view *Sweeney* as a "clearly established" precedent that would have made it "obvious" to Adams and Mesnard that the alleged conduct was illegal and unconstitutional. *Cf. Shafer,* 868 F.3d at 1117.[7]

Shooter also cites *Powell v. McCormick*, 395 U.S. 486 (1969). But there, the Supreme Court merely determined that Adam Clayton Powell, Jr.'s *exclusion* from the House of Representatives (not *expulsion*) presented a justiciable question. *Id.* at 516-50. In doing so, the Court made clear that it was not resolving whether Powell's expulsion would have withstood constitutional scrutiny (or would have even posed a justiciable question): "[W]e will not speculate what the result might have been if Powell had been seated and expulsion proceedings subsequently instituted." *Id.* at 508. Moreover, Powell didn't argue that his due process or equal protection rights had been violated—the sole basis for his challenge was that his exclusion violated Article I, Section 5 of the Constitution. *Id.* at 550. This is the antithesis of the sort of concrete, factually analogous ruling that is necessary to provide notice for qualified-immunity purposes.[8]

---

[6] Although Shooter's complaint doesn't provide the margin of his expulsion vote, the Court may take judicial notice of this fact. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of 'matters of public record.'") (citation omitted).

[7] Additionally, it is unclear whether a decision by a Pennsylvania state court could, for qualified-immunity purposes, provide adequate notice to Arizona-based state officials such as Adams and Mesnard. *Wilson v. City of Boston*, 421 F.3d 45, 56-57 (1st Cir. 2005) (when determining whether the law was "clearly established" for qualified-immunity purposes, courts may consider "Supreme Court precedent," "federal cases outside our own circuit," and "state court decisions *of the state wherein the officers operated*") (citations and internal quotation marks omitted) (emphasis added).

[8] Even *Powell*'s dicta is bad for Shooter. *Powell* contains language (similar to the language in *Sweeney*) suggesting that, in a case involving a true legislative expulsion, the

Finally, Shooter cites *Montoya v. Law Enf't Merit Sys. Council*, 713 P.2d 309 (Ariz. Ct. App. 1985). There, an officer trainee (Montoya) was discharged from his employment "following two incidents involving 'suspicion' as to his 'honesty in the removal of certain monies from the coffee fund.'" *Id.* at 309. In the ensuing lawsuit, Montoya argued his due process rights had been violated. *Id.* at 310. On the one hand, the Arizona Court of Appeals rejected Montoya's claim that he possessed a property interest in his employment, concluding that no such interest arose because Montoya was an at-will employee. *Id.* On the other hand, because charges of misconduct were included in Montoya's personnel file, the court determined he possessed a cognizable liberty interest: "[T]he combination of government defamation plus . . . the discharge of a government employee states a liberty interest claim even if the discharge itself deprives the employee of no property interest protected by the fifth or fourteenth amendments." *Id.* at 310-12. The court ultimately concluded Montoya was entitled to a post-termination hearing to clear his name but left it to the trial court to resolve the precise contours of the hearing. *Id.* at 312.

*Montoya* doesn't establish that Shooter's expulsion violated clearly established law. *Montoya* concerned an employee's termination, not a legislator's expulsion. Additionally, Shooter argues the procedures *preceding* his expulsion were inadequate. *Montoya*, on the other hand, concerned the process Montoya should be given to clear his name *following* his termination. The court didn't hold that the process provided to Montoya before his termination was inadequate. Thus, Shooter's claims in this lawsuit find no support in *Montoya*.[9]

---

expulsion would be permissible if preceded by a vote supported by at least two-thirds of the members of the legislative body. *Id.* at 548 ("Unquestionably, Congress has an interest in preserving its institutional integrity, but in most cases that interest can be sufficiently safeguarded by the exercise of its power to punish its members for disorderly behavior and, in extreme cases, to expel a member with the concurrence of two thirds."). Similarly, Justice Douglas stated in his concurring opinion in *Powell* that "if this were an expulsion case I would think that no justiciable controversy would be presented, the vote of the House being two-thirds or more." *Id.* at 553. Again, such a vote occurred before Shooter was expelled.

[9] In the cross-referenced section of his brief, Shooter also cited *Mecham v. Gordon*, 751 P.2d 957 (Ariz. 1988), *Arizona Indep. Redistricting Comm'n v. Brewer*, 275 P.3d 1267 (Ariz. 2012), and *Baker v. Carr*, 369 US 186 (1962). The Court won't address these cases in depth because Shooter merely cited them in passing. In short, none of these cases

Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Additionally, "a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (citations omitted). Given these principles, it is unnecessary to decide, under the first prong of the qualified-immunity test, whether Shooter's constitutional rights were actually violated. Instead, Adams and Mesnard are entitled to dismissal under the second prong of the qualified-immunity test because Shooter hasn't identified any clearly-established law supporting his claim.

Notably, when Shooter was asked during oral argument to identify the best, most factually-analogous case establishing that the expulsion proceedings in this case were unconstitutional, Shooter demurred and instead urged the Court to consider "the facts" alleged in the complaint. This is not how qualified immunity works. *Cf. Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015) ("If indeed the [defendants] did not violate clearly established law, then we can determine that qualified immunity is appropriate and may thus dispose of the case without undertaking an analysis of whether a constitutional violation occurred in the first instance.").[10]

concerned a legislator's due process rights in an expulsion proceeding. Moreover, in *Brewer*, which involved a challenge to the removal of Chairperson Mathis from the Arizona Independent Redistricting Commission, the Arizona Supreme Court declined to resolve whether this removal "violat[ed] Mathis's due process rights," instead limiting its holding to a determination that the removal effort violated state law—specifically, "Article 4, Part 2, Section 1(10) of the Arizona Constitution." 275 P.3d at 1275, 1278. Accordingly, these cases fail to demonstrate that Defendants violated "clearly established" federal law in Shooter's expulsion proceedings.

[10] *Monserrate v. N.Y. Senate*, 599 F.3d 148 (2d Cir. 2010), which Shooter did not cite, further supports this outcome. *Monseratte* involved a constitutional challenge to the New York Senate's decision to expel a senator who'd been accused of domestic violence. *Id.* at 152-53. The district court rejected a request for injunctive relief and the Second Circuit affirmed, holding, *inter alia*, that the challengers had failed to establish a likelihood of success on their due process and equal protection claims. *Id.* at 154. The court reached this conclusion even though the senator alleged he "was not given copies of the materials

II.     State Claims

Remaining before the Court are Shooter's state-law claims: Count 2 (defamation); Count 3 (false light invasion of privacy); and Count 4 (wrongful termination).

In most instances, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [pendent state-law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction.").

Here, although Defendants would prefer for the Court to retain jurisdiction over the case, and then dismiss the state-law claims against them, so they can clear their names, the Court concludes the *Cohill* factors weigh against retaining jurisdiction over the state-law claims. First, because the case is only a few months old and no trial date has been set, there will be minimal duplication of effort caused by a remand. Defendants argue the infirmity of Shooter's state-law claims is obvious (and, thus, it won't take many judicial resources to dispose of those claims), but this misapprehends the nature of the judicial economy factor. If Defendants are correct about the weakness of the state-law claims, a state-court judge should be able to quickly address them upon remand, using no more resources than would be consumed by this Court. *See, e.g., Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1255-56 (6th Cir. 1996) (recognizing that "[a]fter a 12(b)(6) dismissal, there is a strong presumption in favor of dismissing supplemental claims" and explaining this presumption exists in part because the "same written materials [concerning the state-law claims] could be submitted to a state judge for his decision, with only minimal rewriting");

---

considered by the Select Committee,'" "was not able to cross-examine the two witnesses" who were interviewed, and most of the "meetings of the Select Committee were held in executive session, closed to the public." *Id.* at 159 (internal quotation marks omitted). If anything, *Monseratte* suggests the process preceding Shooter's expulsion also complied with due process. At a minimum, *Monseratte* would not have "ma[d]e it obvious" to Adams and Mesnard that the process followed in this case "violates federal law." *Shafer,* 868 F.3d at 1117.

*Gregory v. Inc. Village of Ctr. Island*, 2016 WL 4033171, *9 (W.D.N.Y. 2016) (granting 12(b)(6) motion to dismiss federal claims but declining to resolve the dismissal arguments contained in the same motion pertaining to state-law claims and instead remanding those claims to state court).

Second, it appears the Maricopa County Superior Court is at least as convenient a forum as this Court. Defendants and their counsel are based in and around Phoenix.

Third, although Defendants may have a legitimate interest in the speedy vindication of their names and reputation, a countervailing "fairness" consideration is that Shooter filed this case in Maricopa County Superior Court. It was Adams (with the State's consent) who chose to remove it based on federal question jurisdiction. Because there is no longer a federal question to be considered, Shooter's choice of forum should be entitled to some weight. *Cf. Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1222 (9th Cir. 2011) (noting "the strong presumption in favor of a domestic plaintiff's choice of forum").

Finally, considerations of federalism and comity are best served by allowing the Arizona state courts to address state-law claims. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *see also Roundtree v. Atl. Dev. & Inv.,* 2009 WL 2132697, *1-3 (D. Ariz. 2009) (dismissing federal claim and then declining to exercise supplemental jurisdiction over remaining state-law claims: "The Court is mindful that the exercise of supplemental jurisdiction may serve the values of judicial economy and convenience . . . but these values are outweighed by the interests of comity and federalism."); *Floyd v. Watkins*, 2015 WL 5056036, *6 (D. Or. 2015) ("The Court closely examined the sole federal law claim [under § 1983] and resolved it in favor of Officer Watkins. State court is a convenient forum for the parties, and declining to exercise supplemental jurisdiction respects the values of federalism and comity."). As another court put it, in a case involving similar procedural circumstances:

> While it is true that the case was properly removed to this Court, the federal

claims which constituted the basis for removal have now been dismissed. Some of the defendants argue that the Court should decide their several motions to dismiss prior to remand. But decision of the issues presented by those defense motions would be dispositive of the state causes of action. The real question now presented is whether, having dismissed the federal claims, this Court should proceed, on the basis of its pendent jurisdiction, to decide the plethora of state law issues contained in the complaint. While the cases cited by the defendants indicate that this Court has the power to hear and dispose of the case notwithstanding the dismissal of the federal claims, the Supreme Court's message is clear. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."

*McGann v. Mungo*, 578 F. Supp. 1413, 1416 (D.S.C. 1982) (citation omitted). Thus, the Court will decline to exercise jurisdiction over the remaining state-law claims and remand them to the Maricopa County Superior Court.

Accordingly, **IT IS ORDERED** that:

(1) Adams's motion to dismiss (Doc. 12) is **granted in part**;

(2) Mesnard's motion to dismiss (Doc. 16) is **granted in part**;

(3) The State's joinders (Docs. 13, 21) are **granted in part**;

(4) Count 1 of the complaint is **dismissed with prejudice**; and

(5) The Clerk of Court shall **remand** this case to the Maricopa County Superior Court and then **terminate** this action.

Dated this 7th day of June, 2019.

Dominic W. Lanza
United States District Judge